**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| STATE OF TEXAS,<br>STATE OF MONTANA<br>　　　*Plaintiffs*,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity<br>as Secretary of Health and Human Services;<br>MELANIE FONTES RAINER, in her<br>official capacity as Director of the Office for<br>Civil Rights; CENTERS FOR MEDICARE<br>& MEDICAID SERVICES; UNITED<br>STATES DEPARTMENT OF HEALTH<br>AND HUMAN SERVICES,<br><br>　　　*Defendants*. | Case No.  6:24-cv-211 |

---

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY
INJUNCTION, AND STAY OF AGENCY ACTION**

---

Through a new rule published on May 6, 2024, Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522 (the "Final Rule"), the Biden Administration seeks to compel physicians, hospitals, and States to perform and pay for harmful "gender-transition" procedures. HHS issued this Final Rule purporting to "clarify the scope of sex discrimination" under Section 1557 of the Affordable Care Act (ACA). *See* 89 Fed. Reg. 37,671. In doing so, the Final Rule reinterprets Title IX's prohibition of discrimination "on the basis of sex" to include discrimination on the basis of "gender identity." But neither Section 1557 nor Title IX permit to promulgate this sweeping new rule.

To ensure the Plaintiffs States' most vulnerable populations can keep receiving healthcare, Texas and Montana respectfully request the Court to postpone the Final Rule's effective date, and issue a temporary restraining order and preliminary injunction. Without

1

relief, the Plaintiff States' physicians, hospitals, and Medicaid programs are faced with an impossible choice: they must violate and abandon state law or risk devastating financial loss.

## STANDARD

Plaintiffs seeking a temporary restraining order or preliminary injunction must establish (1) that they are likely to succeed on the merits of their claims; (2) "that [they] [are] likely to suffer irreparable harm in the absence of preliminary relief;" (3) that the balance of equities tips in [their] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The standards for securing a temporary restraining order or preliminary injunction are substantively the same. *Clark v. Richard*, 812 F.2d 991, 993 (5th Cir. 1987); *Texas v. United States*, 524 F. Supp. 3d 598, 651 (S.D. Tex. 2021).

Section 705 of the APA, meanwhile, "authorizes reviewing courts to stay agency action pending judicial review." *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (citing 5 U.S.C. § 705). "Motions to stay agency action pursuant to these provisions are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Id.* (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n,* 772 F.2d 972, 974 (D.C. Cir. 1985)); s*ee also Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (granting stay of agency action under 5 U.S.C. § 705 and applying preliminary injunction factors).

## ARGUMENT

### I.    This Court has jurisdiction.

Plaintiff States have standing to challenge the Final Rule. To establish standing, Plaintiff States "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Book People, Inc. v. Wong*, 91 F.4th 318, 328 (5th Cir. 2024) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). "If, in a suit challenging the legality of government action, the plaintiff is himself an object of the action . . . there is ordinarily little

question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (cleaned up). When addressing standing, courts must "accept as valid the merits of [a plaintiff's] legal claims." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022).

Here, Plaintiff States are the object of the Final Rule; it explicitly applies to the States' administration of their Medicaid and Children's Health Insurance Programs (CHIP). By its own terms, the Final Rule regulates Plaintiff States. 89 Fed. Reg. at 37,694 (to be codified at 45 C.F.R. § 92.4).

The Final Rule also threatens draconian sanctions for noncompliance. The ACA incorporates Title IX's public and private enforcement mechanisms for Section 1557. 42 U.S.C. § 18116(a). Under HHS's enforcement authority, OCR or the Attorney General may investigate entities for noncompliance. 18 U.S.C. § 3486; 45 C.F.R. §§ 80.6–80.11; 45 C.F.R. Pt. 81; 45 C.F.R. § 92.5. And being subjected to such burdensome investigations itself inflicts injuries. *See Texas v. Garland*, No. 5:23-CV-034-H, 2024 WL 967838, at *15 (N.D. Tex. Feb. 27, 2024) ("Texas is injured by the costs of compliance, litigation, and administrative investigations created by the [law at issue]."); *see also id.* ("Texas incurs costs from . . . responding to . . . charges, investigations, and lawsuits."). If HHS's Office for Civil Rights (OCR) finds a covered entity, such as Plaintiff States' Medicaid programs and Texas Tech University Health Science Centers, in noncompliance, HHS may require them to take remedial action or lose their federal funding. *See* 45 C.F.R. § 80.8(a). Healthcare providers who receive federal funding but who do not comply with HHS's interpretation of Section 1557 may be excluded by HHS from future eligibility for federal healthcare funding. 42 U.S.C. § 1320c-5. Plaintiff States need not wait for specific enforcement to satisfy the requirements of standing. *Texas v. EEOC*, 933 F.3d at 449.

In addition to these penalties for violations of Section 1557, it is uncontested that the Final Rule  imposes additional costs in the form of required expenditures to

demonstrate compliance with the terms of the Final Rule. 89 Fed. Reg. at 37,677–85. "A high risk of economic injury is sufficiently real, immediate, and direct" to satisfy the requirements for standing. *Texas Ass'n of Manufacturers v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021).

In addition to the loss of federal funding unless they comply with the Final Rule, the Plaintiff States face an imminent, irreparable, sovereign injury. Under Texas law, a physician or healthcare provider may not knowingly perform a sterilizing surgery or mastectomy, or provide puberty blockers or cross-sex hormones, to minors "[f]or the purpose of . . . affirming the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." Tex. Health & Safety Code § 161.702. Texas law also excludes these same procedures from its CHIP program. Tex. Health & Safety § 62.151(g). Similarly, Texas excludes "[s]ex change operations" from its Medicaid program. Tex. Health & Human Servs., Tex. Medicaid Provider Procedures Manual § 1.11 (May 2024), available at https://tinyurl.com/TxPPM. And neither the Texas Medicaid program nor the Texas Children's Insurance Program provide reimbursement to a physician or healthcare provider for the provision of a procedure or treatment to a child that is prohibited by Tex. Health & Safety Code § 161.702. Exh. A at ¶6. Because the Final Rule stipulates that such categorical exclusions are "discrimination," Texas faces losing billions of dollars in federal healthcare dollars. 89 Fed. Reg. at 37,701, *to be codified at* 45 C.F.R. § 92.207(b)(4)–(5); *see also* Exh. A at ¶7.

The effects of the Final Rule on the Texas Tech University System demonstrate the impossible choice that healthcare providers face. Texas Tech University System operates two health science centers: Texas Tech University Health Science Center (TTUHSC) and Texas Tech University Health Science Center El Paso (TTUHSC EP). Under the Final Rule, they are threatened with the withdrawal of millions of dollars of healthcare funding unless they violate state law. *See* Exh. B.

Similarly, Montana prohibits the provision of surgical procedures, supraphysiologic doses of testosterone or other androgens, or puberty blockers to a female minor to address a minor's perception that her gender or sex is not female or to a male minor to address the minor's perception that his gender or sex is not male. Mont. Code. Ann. § 50-4-1004(1). Among other things, Montana law also prohibits the use of public funds for the purpose of providing such medical treatments and specifically prohibits Montana Medicaid and CHIP (and other insurers) from reimbursing or providing coverage for such treatments. *Id.* §§ 50-4-1004(3), (6), 50-4-1006, 53-6-135. Although this law, SB 99, has been preliminary enjoined by a state district judge, Montana has appealed that ruling.

Under the Final Rule, however, Montana healthcare providers must violate state law to retain federal funding. *See* NPRM, 87 Fed. Reg. at 47,867 ("[A] provider's view that no gender-transition or other gender-affirming care can ever be beneficial for such an individuals (*or its compliance with a state or local law that reflects a similar judgment*) is not a sufficient basis for a judgment that a health service is not clinically appropriate." (emphasis added)).

Montana did not pay for gender transition procedures, such as chest mastectomies, for minors prior to SB 99 and still does not pay for those procedures. The Final Rule would force the State to pay for those procedures. Montana receives two billion dollars in federal financial aid administered by HHS each year. The Final Rule unlawfully threatens to subject Montana to onerous federal investigations and withdrawal of federal funding for attempting to protect its citizens from harmful medical procedures and for declining to insure those procedures in its health plans.

This Court has jurisdiction to remedy Plaintiff States' irreparable injuries resulting from the Final Rule. Numerous courts have made clear that preventing a State from enforcing its laws is itself an irreparable harm. *See, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("[T]he inability to enforce its duly enacted plan clearly inflicts irreparable

harms on the State."); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time [a State is blocked] from effectuating statutes enacted by reprsentatives of its people, it suffers a form of irreparable injury."); *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020). When the State is blocked from implementing its laws, "the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its law." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013); *Coal for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997). Delaying and enjoining the enforcement of the Final Rule would remedy Plaintiff States' sovereign injuries and the imminent threat of substantial economic harm.

## II.    Plaintiff States are likely to prevail on the merits of their claims.

The likelihood of success on the merits "is arguably the most important" factor for preliminary relief. *Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 239 (5th Cir. 2024); *see also Mock v. Garland*, 75 F.4th 563, 587 n.60 (5th Cir. 2023). Plaintiffs challenge the Final Rule on statutory grounds and are likely to succeed on the merits of their claims because the Final Rule is "in excess of statutory . . . authority," "contrary to constitutional right," and "arbitrary" and "capricious." 5 U.S.C. § 706(2).

### A.  The Final Rule Exceeds Statutory Authority.

Because administrative agencies are ceatures of statute, they possess only the authority that Congress has provided. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers powers upon it."). It is a core principle of American law that an agency may not rewrite statutory terms to suit its own sense of how the law should operate. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

HHS exceeded its statutory authority when it promulgated the Final Rule, which attempts to codify a legal duty to perform "gender-affirming" medical activities as a condition of receiving federal funds. HHS's stated authority for the promulgation of this

Final Rule is Section 1557 and Title IX. *See, e.g.*, 89 Fed. Reg. 37,522.  But Congress did not confer HHS with authority to define "[d]iscrimination . . . on the basis of sex" under Section 1557. Section 1557 does not define "sex discrimination" at all. It is a healthcare statute whose prohibition on sex discrimination rests on the incorporation of Title IX, a 1972 educational statute that recognizes sex as an element of biology.

In deciding whether the Final Rule is consistent with Section 1557 and Title IX, "[w]e start where we always do: with the text of the statute." *Career Colleges & Sch. of Texas*, 98 F.4th at 240 (quoting *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023)). "Other sources that are helpful in determining what Congress meant when it passed [Title IX in 1972] include contemporaneous dictionaries, related statutes, and past statements of the Department." *Id.*

"Title IX's text, structure, and purpose" show that "Congress intended to prohibit sex discrimination on the basis of the *biological* differences between males and females." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 687 (N.D. Tex. 2016) (citing 20 U.S.C. § 1681) (emphasis added). "When Title IX was enacted in 1972, the term 'sex' was commonly understood to refer to the biological differences between males and females." *Id.* at 688 (citing various dictionaries). The American Heritage Dictionary defined "sex" as "[t]he property or quality by which organisms are classified according to their reproductive functions." American Heritage Dictionary 1187 (1976). The Webster's Third New International Dictionary defined it as "[t]he sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change. . . ." Webster's Third New International Dictionary 2081 (1971); *see also* 9 Oxford English Dictionary 578 (1961). This commonly understood meaning of "sex" demonstrates that "[t]he text of Title IX indicates Congress's binary definition of 'sex,'" and "[i]f Congress had intended to enact a new, different, or expansive definition of prohibited sex

discrimination in Section 1557, it knew how to do so and would not have chosen to explicitly incorporate its meaning from Title IX." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d at 687–88.

Section 1557 incorporated *all* of Title IX by reference, not just its general prohibition against sex discrimination (20 U.S.C. § 1681(a)). *See id.* at 690 (holding that Congress's inclusion of "et seq." after referencing Title IX means it "intended to incorporate the entire statutory structure"). Accordingly, Section 1557 incorporated numerous separate provisions in Title IX that allow for sex-based distinctions, confirming that the statute's prohibition on sex-based discrimination is limited to biological sex.

While Title IX provides that recipients of federal funding for education programs or activities shall not discriminate "on the basis of sex," 20 U.S.C. § 1681(a), the statute explicitly authorizes separation based on sex in certain situations, including "maintaining separate living facilities for the different sexes," 20 U.S.C. § 1686, and specified single-sex educational institutions, organizations, activities, and scholarship awards, 20 U.S.C. § 1681(a). Title IX also exempts single-sex organizations like fraternities, sororities, the Boy Scouts of America, and Boy or Girl conferences to maintain their exclusivity. 20 U.S.C. § 1681(a)(6)-(7). Traditional single-sex schools and certain religious schools are also exempt and may limit membership to one sex. 20 U.S.C. § 1681(a)(3), (5)). These exceptions presume—and only make sense in the context of—biological sex as the protected category. *See Franciscan All., Inc.*, 227 F. Supp. 3d at 687–88 ("These authorized distinctions based on sex can only reasonably be interpreted to be necessary for the protection of personal privacy, and confirm Congress's biological view of the term 'sex.'"). "[T]he text, structure, and purpose reveal that the definition of sex in Title IX's prohibition of sex discrimination unambiguously prevented discrimination on the basis of the *biological* differences between males and females." *Franciscan All., Inc.*, 227 F. Supp. 3d at 688 (emphasis added).

8

The Final Rule's reliance on *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020), is similarly misplaced. *See, e.g.*, 89 Fed. Reg. 37,574. Defendants conflate Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a), with Title VII's prohibition on discrimination "because of . . . sex," 42 U.S.C. § 2000e-2(a)(1); *see* 89 Fed. Reg. 37,574 ("*Bostock*'s discussion of the text of Title VII informs the OCR's analysis of title IX and section 1557."). But *Bostock* does not apply to Section 1557. Outside of Title VII, the *Bostock* Court explicitly declined to "prejudge" whether other nondiscrimination laws—like Title IX—prohibit discrimination based on sexual orientation and transgender status, or whether its ruling affected common practices like maintaining sex-separated "bathrooms." *Bostock*, 590 U.S. at 681. "*Bostock* . . . was limited only to Title VII itself" and "d[id] not stretch to [other statutes]." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *see also Adams v. Sch. Bd. of St. Johns County*, 57 F.4th 791, 808 (11th Cir. 2022) (en banc) (holding that *Bostock*'s reasoning applies only to Title VII, and describing the argument that it applies to Title IX as "faulty").

And Title VII is different from Title IX. Title VII prohibits employment discrimination "because of such individual's . . . sex[],"42 U.S.C. § 2000e- 2(a), while Title IX prohibits education discrimination "on the basis of sex," 20 U.S.C. § 1681(a). The statutes contain different language with different results for different contexts. *Neese v. Becerra*, 640 F. Supp. 3d 668, 675–84 (N.D. Tex. 2022) (Kacsmaryk, J.) (*Bostock* and its reasoning do not apply to Title IX). Moreoover, the *Bostock* Court held that the phrase "because of" in Title VII mandated a sweeping but-for causation requirement. *Bostock*, 590 U.S. at 656. The Supreme Court has tendered no such ruling regarding the phrase "on the basis of sex" as used in Title IX. 20 U.S.C. § 1681(a).

That Section 1557 incorporates Section 794 of Title 29 in its prohibition on discrimination further demonstrates Defendants' new interpretation exceeds statutory authority. Section 794 specifically excludes from its scope of prohibited discrimination

"transsexualism [and] . . . gender identity disorders . . . not resulting from physical impairements," 29 U.S.C. § 705(20)(F)(i), and "homosexuality or bisexuality," 29 U.S.C. § 705(20)(E). If the Final Rule's interpretation were allowed to stand, it would result in an internal conflict in Section 1557 itself.

Defendants also import their reinterpretation of Title IX into the Social Security Act (SSA), contending that "section 1557 applies broadly" to "health insurance coverage and other health-related coverage" regulations. *See* 89 Fed. Reg. 37,600; *see also* 89 Fed. Reg. 37,691. The Final Rule amends the standard contract requirements under Medicaid and CHIP, prohibiting entities from "discriminat[ing] against individuals eligible to enroll on the basis of . . . sex which includes . . . sexual orientation [and] gender identity." *Id.* (to be codified at 42 C.F.R. § 483.3(d)(4)). This amendment further prohibits entities from "us[ing] any policy or practice that has the effect of discriminating on the basis of . . . sex." *Id.*

Defendants invoke CMS's statutory authority under three provisions: (1) section 1902(a)(4) of the SSA (codified at42 U.S.C. § 1396a(a)(4)), "which authorizes the Secretary to adopt methods of administration necessary for the proper and efficient operation of the Medicaid State plan," 89 Fed. Reg. 37,668; *see also* 89 Fed. Reg. 37,691 (to be codified at 42 C.F.R. § 438.3(d)(4)) (invoking 42 U.S.C. § 1302, which authorizes HHS to "publish such rules and regulations . . . as may be necessary to the efficient administration of the functions with which [it] is charged"); (2) section 1902(a)(19) of the SSA (codified at 42 U.S.C. 1396a(a)(19)), "which requires the Medicaid State plan to provide safeguards as necessary to assure that covered services are provided in a manner consistent with the best interests of the recipients," 89 Fed. Reg. 37,668 and (3) section 2101(a) of the SSA (codified at 42 U.S.C. 1397aa(a)), "which permits provision of funds to States to enable them to initiate and expand the provision of child health assistance to uninsured, low income children in an effective and efficient manner," 89 Fed. Reg. 37,668.

**10**

Those three provisions do not provide the adequate basis for CMS to prohibit discrimination on the basis of sexual orientiation and gender identity. *First*, CMS's limitless reading of "methods of administration" is inconsistent with both text and statutory context, as well as the "clear notice" requirements for spending legislation and the major questions doctrine. Novel civil rights laws are not "methods of administration." Congress offered examples of "methods of administration," giving "more precise content" to the term. *United States v. Williams*, 553 U.S. 285, 294 (2008). It includes setting "personnel standards" and providing for "medical personnel" and transporting patients. 42 U.S.C. § 1396a(a)(4). Those mundane administrative tasks are nothing like the power to declare new civil rights guarantees that will transform the practice of medicine.

*Second*, CMS's conclusory assertion that the Final Rule "ensures the best interest of beneficiaries" lacks merit. *Contra* 89 Fed. Reg. 37,668. The procedures the Final Rule's CMS regulations require would permanently harm minors and others, including turning recipients of these procedures into lifelong medical patients and rendering patients infertile. *See* Dkt. 1 at ¶¶ 103–05.

*Finally*, the Final Rule does not "initiate and expand the provision of child health assistance to uninsured, low income children in an effective and efficient manner" when it redefines "on the basis of sex" to include gender identity and sexual orientation. The redefinition is neither efficient nor effective because it puts Plaintiff States in an impossible position: abandon State laws or risk losing enormous amounts of federal funding. Even so, compliance would be anything but "efficient." The Final Rule stipulates that compliance costs to covered entities will range between $523 million to $1.3 billion. 89 Fed Reg. 37,677.

## B.  The Final Rule is arbitrary and capricious.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary," "capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Courts "do not defer to the agency's conclusory or unsupported suppositions," *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557 (D.C. Cir. 2010), nor are agency actions "involv[ing] an issue of deep economic and political significance" entitled to deference, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1242 (9th Cir. 2018) (cleaned up). This Court cannot "supply a reasoned basis for the agencies' actions that the agencies themselves have not given." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. (cleaned up). Nor can the agency's litigation counsel. *Id.* at 50 ("courts may not accept appellate counsel's *post hoc* rationalizations for agency action").

Here, the Final Rule is arbitrary and capricious in several ways. Under the guise of "nondiscrimination," Defendants require healthcare providers' and States' commitment to gender ideology over the biological reality that the sexes are different in ways that affect health and risks. In doing so, Defendants failed to offer a "reasoned explanation" of the Final Rule's departure from the historic understanding of "sex" as used in Title IX. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). By requiring healthcare professionals to ignore the medical and biological differences between the sexes, 89 Fed. Reg. at 37,593-94, the Final Rule will prevent healthcare professionals from using their reasonable medical judgment and will damage the doctor-patient relationship and undermine sound medical treatment. The Final Rule does not engage with the biological and medical realities that sex has in medical care, or the "life-and-death" risks associated with ignoring them. *See* 85 Fed. Reg. at 37,190.

Moreover, while the Final Rule purports to expand the scope of discrimination on the basis of sex, the Final Rule refuses to define "sex." *See* 89 Fed. Reg. 37,575 ("[I]t is not

necessary to define 'sex' in this rule."). But without defining sex, HHS cannot reasonably explain what it means to discriminate "on the basis of" sex. Nor did Defendants adequately consider the disproportionately negative impact of the "gender-transition" mandate on women and girls, contrary to Title IX's purpose. Finally, Defendants failed to consider the negative effect of rendering an untold number of minors and adults infertile for the rest of their lives.

### C.  The Final Rule is contrary to the Constitution.

"In the absence of a clear mandate" in Section 1557 or the Social Security Act, "it is unreasonable to assume that Congress intended to give [the Secretary of HHS] unprecedented power" over American social policy and standards of care. *See Indus. Union Dep't v. AFL-CIO v. American Petroleum Inst.*, 448 U.S. 607, 645 (1980). Whether and when to permit "gender-transition" medical activities is an issue of vast policy and political significance. Those questions are to be answered by the States through their elected representatives. If Congress meant to impose this gender-transition mandate through Section 1557 or the Social Security Act, the major questions doctrine requires it to speak clearly.

Moreover, the legitimacy of an exercise of the federal spending power "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Sebelius*, 567 U.S. at 577. When "conditions take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the States to accept policy changes." *Id.* at 680. "Though Congress' power to legislate under the spending power is broad, it does not include surprising the States with post-acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hops. v. Halderman*, 451 U.S. 1, 25 (1981). "Recipients cannot knowingly accept the deal with the Federal Government unless they would clearly understand the obligations that would come along with doing so." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219 (2022) (internal quotations omitted). The

**13**

Plaintiff States could not have known that Defendants would claim a new condition—under Section 1557, Title IX, or the SSA—that would require them to provide "gender-affirming" treatments in violation of state law. Forcing Plaintiff States and their hospitals and physicians to comply with the Final Rule under threat of the loss of all federal healthcare funds is unconstitutionally coercive. *See Sebelius*, 567 U.S. at 580. Defendants have no authority to condition federal funding on such an untenable choice. *Pennhurst*, 451 at 25.

A valid exercise of the Spending Power—which the Final Rule is not—can only *induce* States to change their own laws. It does not preempt state law, and the Final Rule's statement to the contrary is wrong. Non-State recipients of federal healthcare funding, such as local governments and private entities, cannot change State law by accepting federal funds with allegedly preemptive conditions.

## III.    Plaintiff States will suffer irreparable injury.

"To show irreparable injury . . . it is not necessary to demonstrate that harm is inevitable and irreparable," *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986); rather, Plaintiffs need only demonstrate that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (quotation marks omitted). As detailed in section I, *supra*, the Plaintiff States face an imminent, irreparable, sovereign injury from the Final Rule, which purports to preempt any contrary state law.

In addition, while financial injuries are generally reparable, here, sovereign immunity is a bar to Plaintiff States' recovery. *Texas v. EPA*, 829 F.3d at 434; *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Accordingly, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas*, 829 F.3d at 433 (emphasis in original); *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022).

## IV.    The balance of harms and public interest favor Plaintiff States.

When governmental action is implicated, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). To preserve the relative positions of the parties until a trial on the merits, federal courts regularly enjoin federal agencies from implementing and enforcing new regulations pending litigation challenging them. *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015). An injunction promotes and protects the public interest by avoiding the myriad harms that Defendants' lawlessness will bring. There is "no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (cleaned up). "The public interest is served by maintaining our constitutional structure," giving Plaintiff States' laws their full due. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618–19 (5th Cir. 2021).

### CONCLUSION

For these reasons, the Court should postpone the Final Rule's effective date, and enjoin Defendants from enforcing it and from interpreting Section 1557 as prohibiting discrimination based on sexual orientation or gender identity pending the outcome of this case.

**15**

Dated: June 11, 2024

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**RYAN D. WALTERS**
Chief, Special Litigation Division

*/s/ Amy S. Hilton*
**AMY SNOW HILTON**
Special Counsel
Amy.Hilton@oag.texas.gov

**ETHAN SZUMANSKI**
Special Counsel
Ethan.Szumanski@oag.texas.gov

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

**COUNSEL FOR STATE OF TEXAS**

Respectfully Submitted.

**AUSTIN KNUDSEN**
Attorney General of Montana

*/s/ Christian B. Corrigan*
**CHRISTIAN B. CORRIGAN**
  *Solicitor General*

**PETER M. TORSTENSEN, JR.**
  *Deputy Solicitor General*

Montana Department of Justice
215 N. Sanders Helena, MT 59601
Christian.Corrigan@mt.gov
Peter.Torstensen@mt.gov

**COUNSEL FOR STATE OF MONTANA**

**16**

**CERTIFICATE OF CONFERENCE**

I hereby certify that on June 11, 2024, I emailed James Gillingham, Assistant United States Attorney for the Eastern District of Texas and designated to accept service on behalf of the United States (*see* https://www.txed.uscourts.gov/sites/default/files/HR_Docs/20230601T104425.pdf) via email regarding this Motion. At the time of filing, no response had been received.

*/s/ Amy S. Hilton*
Amy S. Hilton

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on June 11, 2024, and I sent a copy of the foregoing document via e-mail to James Gillingham, Assistant United States Attorney.

*/s/ Amy S. Hilton*
Amy S. Hilton

**17**