# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | |
|---|---|
| STATE OF TEXAS,<br>STATE OF MONTANA,<br><br>     Plaintiffs,<br><br>    v.<br><br>XAVIER BECERRA, in his official capacity<br>as Secretary of Health and Human Services;<br>MELANIE FONTES RAINER, in her<br>official capacity as Director of the Office for<br>Civil Rights; CENTERS FOR MEDICARE<br>& MEDICAID SERVICES; UNITED<br>STATES DEPARTMENT OF HEALTH<br>AND HUMAN SERVICES,<br><br>    Defendants. | Case No. 6:24-cv-211-JDK |

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND STAY OF AGENCY ACTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................................1

BACKGROUND ................................................................................................................................2

I.      Statutory and Regulatory Background................................................................................2

          A.      Section 1557 of the Affordable Care Act................................................................2

          B.      HHS's 2024 Rule Implementing § 1557 ................................................................3

II.     Procedural History .............................................................................................................6

LEGAL STANDARD .........................................................................................................................6

ARGUMENT ....................................................................................................................................6

I.      Plaintiffs Are Not Likely To Succeed on the Merits .........................................................8

          A.      The Rule's Prohibition of Discrimination on the Basis of Gender Identity Is Consistent with § 1557 and Does Not Exceed Statutory Authority .............................8

          B.      The Revised CMS Regulations Do Not Exceed Statutory Authority .......................12

          C.      The Rule Is Not Arbitrary and Capricious .............................................................13

          D.      The Rule Is Not Contrary to the Constitution ........................................................15

II.     Plaintiffs Fail To Show Imminent Irreparable Harm .......................................................17

III.    The Equities and the Public Interest Weigh Against a Preliminary Injunction .....................24

IV.    Any Relief Should Be Limited..........................................................................................24

CONCLUSION ................................................................................................................................25

# INTRODUCTION

Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in any health program or activity that receives federal financial assistance.  On May 6, 2024, the U.S. Department of Health and Human Services ("HHS") issued a Final Rule ("the Rule") implementing § 1557's nondiscrimination protections and clarifying covered entities' obligations under the statute.[1]  The Rule, among other things, prohibits health insurance issuers that receive federal funds from providing coverage in a discriminatory manner, requires covered health care providers and insurance issuers to provide meaningful access to their services to individuals with limited English proficiency, reinforces federal protections for religious freedom and conscience, and applies § 1557's nondiscrimination requirements to telehealth and patient care decision support tools.  And, consistent with the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Rule clarifies that § 1557's prohibition against sex discrimination necessarily encompasses discrimination on the basis of sexual orientation and gender identity.

Plaintiffs Texas and Montana, however, wish to undo these efforts to effectuate § 1557's nondiscrimination requirements.  In their motion for preliminary relief, they challenge only the lawfulness of the Rule's prohibition against gender identity discrimination, yet they seek to postpone the effective date of the Rule *in its entirety*.  Plaintiffs are not entitled to such extraordinary—and extraordinarily sweeping—relief.  They are not likely to succeed on the merits because the protections against gender identity discrimination they challenge flow ineluctably from *Bostock*, which explained that, as a matter of text and logic, discrimination on the basis of gender identity "necessarily entails discrimination on the basis of sex."  590 U.S. at 669.  The Rule is thus wholly consistent with § 1557's prohibition on sex discrimination and is otherwise lawful.  Plaintiffs also fail to demonstrate that they will be imminently and irreparably harmed by the Rule.  And the balance of the equities and public interest weigh decidedly in favor of allowing the Rule—and the nondiscrimination protections it

---

[1] *See* Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522 (May 6, 2024).

implements—to go into effect.  Plaintiffs' motion for preliminary relief should accordingly be denied in its entirety.

## BACKGROUND

### I.      Statutory and Regulatory Background

#### A.      Section 1557 of the Affordable Care Act

Section 1557 of the ACA provides that "an individual shall not, on the ground[s] prohibited under" various longstanding federal civil rights statutes—specifically, Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, and § 504 of the Rehabilitation Act of 1973—"be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."  42 U.S.C. § 18116(a).  In short, § 1557 prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in health programs or activities, any part of which receive federal funds.[2]

Section 1557 further provides that violations of its nondiscrimination requirements "shall" be addressed via "[t]he enforcement mechanisms provided for and available under" the referenced civil rights statutes, *id.*, and those mechanisms include multiple layers of process and review.  *See, e.g.*, 20 U.S.C. § 1682 (Title IX); 42 U.S.C. § 2000d-1 (Title VI).[3]  Upon receiving a complaint or "any other information indicat[ing]" a federal funding recipient's possible noncompliance with § 1557, HHS's Office for Civil Rights ("OCR") will first conduct an investigation, during which it will consider all factors and circumstances "relevant to a determination as to whether the recipient failed to comply" with the statute.  45 C.F.R. § 80.7(c).  If OCR finds a "failure to comply," it must then "inform the recipient" of its noncompliance and seek to "resolve[]" the matter "by informal means."  *Id.*

---

[2] Section 1557 also addresses discrimination occurring under "any program or activity that is administered by an Executive Agency or any entity established under" Title I of the ACA (e.g., State-based marketplaces for health care coverage).  42 U.S.C. § 18116(a).

[3] Title VI's and Title IX's enforcement provisions are materially the same.  *Compare* 42 U.S.C. § 2000d-1, *with* 20 U.S.C. § 1682.  The enforcement procedures under both statutes are also governed by the same implementing regulations.  *See* 45 C.F.R. § 86.71 (adopting and incorporating for purposes of Title IX the "procedural provisions applicable to Title VI"); 45 C.F.R. §§ 80.6-.11 (Title VI).

§ 80.7(d)(1); *see* 20 U.S.C. § 1682.  If "compliance cannot be secured by voluntary means," HHS may choose to "effect[]" such compliance by terminating or withholding federal funding.  20 U.S.C. § 1682.[4]  But any decision to withhold funds must be preceded by "an express finding on the record, after opportunity for hearing, of a failure to comply with" § 1557.  *Id.*  The required hearing is subject to robust procedural protections.  *See* 45 C.F.R. §§ 80.9, 81.1-.86.  If a failure to comply is ultimately found, HHS must submit a "full written report" to congressional committees before any withholding of funds can take effect.  20 U.S.C. § 1682.  And any such withholding "shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found."  *Id.*  Moreover, any final decision by HHS to terminate or withdraw funding is subject to judicial review.  *Id.* § 1683.  Accordingly, the ultimate arbiters of any alleged violation of § 1557 are Article III courts.

### B.    HHS's 2024 Rule Implementing § 1557

On May 6, 2024, HHS published a Final Rule implementing § 1557's nondiscrimination requirements.  *See* 89 Fed. Reg. 37,522; *see also* 45 C.F.R. § 92.1 ("The purpose of this part is to implement section 1557 of the [ACA] . . . .").[5]  The Rule provides that "an individual must not, on the basis of race, color, national origin, sex, age, disability, or any combination thereof, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any health program or activity operated by" an entity covered by the Rule.  45 C.F.R. § 92.101(a)(1).[6]  And as relevant here, "[d]iscrimination on the basis of sex" includes discrimination on the basis of gender identity.  *Id.* § 92.101(a)(2)(iv).

---

[4] HHS may alternatively refer the matter to the U.S. Department of Justice to secure compliance "by any other means authorized by law."  20 U.S.C. § 1682; *see* 45 C.F.R. § 80.8(a).  Even still, this alternative is not available until HHS has determined that "compliance cannot be secured by voluntary means."  20 U.S.C. § 1682.

[5] Citations to the regulatory text moving forward will be to the Rule's provisions as they will be codified in the Code of Federal Regulations.  *See* 89 Fed. Reg. at 37,691-703.

[6] The Rule defines "[c]overed entity" to include any "recipient of Federal financial assistance," including States.  45 C.F.R. § 92.4.  "Health program or activity" is defined to encompass in relevant part "[a]ny project, enterprise, venture, or undertaking" to "[p]rovide clinical, pharmaceutical, or medical care" or to "[p]rovide or administer health-related services, health insurance coverage, or other health-related coverage."  *Id.*

3

In addition to this general nondiscrimination provision, the Rule includes more specific provisions that describe covered entities' obligations under § 1557 in more detail. For instance, the Rule requires covered entities to, among other things, "take reasonable steps to provide meaningful access" to their health programs for "individual[s] with limited English proficiency," 45 C.F.R. § 92.201; "ensure that communications with individuals with disabilities . . . are as effective as communications with non-disabled individuals," *id.* § 92.202; and use "patient care decision support tools" in a nondiscriminatory manner, *id.* § 92.210. The Rule also describes more specifically the nondiscrimination requirements to which insurance issuers and health care providers are subject.

Section 92.207 of the Rule prohibits covered entities that provide or administer health insurance from denying coverage, denying or limiting coverage for a claim, imposing additional cost sharing, or imposing other limitations or restrictions on coverage "on the basis of race, color, national origin, sex, age, disability, or any combination thereof." *Id.* § 92.207(b)(1). Among other specific prohibitions, insurance issuers may not deny coverage to an individual "based upon the individual's sex assigned at birth, gender identity, or gender otherwise recorded"; "implement a categorical coverage exclusion or limitation for all health services related to gender transition or other gender-affirming care"; or otherwise deny coverage "for specific health services related to gender transition or other gender-affirming care if such denial . . . results in discrimination on the basis of sex." *Id.* § 92.207(b)(3)-(5). Yet § 92.207 makes clear that "[n]othing in th[e] section requires coverage of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting coverage of the health service or determining that such health service fails to meet applicable coverage requirements, including reasonable medical management techniques such as medical necessity requirements." *Id.* § 92.207(c). For example, "a nondiscriminatory determination that care is not medically necessary based on a patient's anatomy or medical need is permissible." 89 Fed. Reg. at 37,607. A denial decision, however, cannot "be based on unlawful animus or bias, or constitute a pretext for discrimination." 45 C.F.R. § 92.207(c).

Section 92.206 addresses sex discrimination specifically and requires health care providers to "provide individuals equal access to [their] health programs and activities without discriminating on

the basis of sex." *Id.* § 92.206(a). Providers cannot, for instance, deny or limit health services, "including those that have been typically or exclusively provided to, or associated with, individuals of one sex," based on a patient's "sex assigned at birth, gender identity, or gender otherwise recorded." *Id.* § 92.206(b)(1). Nor can they "treat[] individuals differently or separat[e] them on the basis of sex in a manner that subjects any individual to more than de minimis harm." *Id.* § 92.206(b)(3); *see* 89 Fed. Reg. at 37,593 (clarifying that the Rule does not prohibit "a covered entity from operating sex separated programs and facilities"). And as relevant here, health care providers cannot deny or limit health services sought for the purpose of gender transition or deny or limit other gender-affirming care "that the covered entity would provide to an individual for other purposes if the denial or limitation is based on an individual's sex assigned at birth, gender identity, or gender otherwise recorded." *Id.* § 92.206(b)(4). But the Rule again makes clear that

> [n]othing in [§ 92.206] requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service, including where the covered entity typically declines to provide the health service to any individual or where the covered entity reasonably determines that such health service is not clinically appropriate for a particular individual.

*Id.* § 92.206(c). That is, the Rule "does not . . . require a specific standard of care or course of treatment for any individual or otherwise interfere with individualized clinical judgment about the appropriate course of care for a patient." 89 Fed. Reg. at 37,595; *see id.* at 37,596 (underscoring that the Rule does not "compel[] clinicians to provide a service that they do not believe is medically appropriate for a patient"). It simply provides that decisions about care cannot "be based on unlawful animus or bias, or constitute a pretext for discrimination." 45 C.F.R. § 92.206(c).

Finally, the Rule also includes revisions to nondiscrimination provisions found in Centers for Medicare & Medicaid Services ("CMS") regulations that govern Medicaid and the Children's Health Insurance Program ("CHIP"). *See* 42 C.F.R. §§ 438.3(d)(4), 438.206(c)(2), 440.262, 457.495(e). HHS revised those regulations based on § 1557 as well as separate statutory authority under provisions of the Social Security Act ("SSA"). *See* 89 Fed. Reg. at 37,668.[7] The revised CMS regulations preclude

---

[7] *See* 42 U.S.C. § 1396a(a)(4) (authorizing the Secretary of HHS to adopt "methods of administration . . . necessary for the proper and efficient operation of" the Medicaid State plan); *id.*

Medicaid and CHIP programs and their contracted managed care plans from discriminating against individuals "eligible to enroll on the basis of race; color; national origin; disability; or sex" and further provide, as relevant here, that sex discrimination includes discrimination on the basis of gender identity.  42 C.F.R. § 438.3(d)(4).

## II.    Procedural History

Plaintiffs filed this lawsuit on June 10, 2024, against the Secretary of HHS, the Director of OCR, CMS, and HHS.  Compl., ECF No. 1.  They then filed a Motion for Temporary Restraining Order, Preliminary Injunction, and Stay of Agency Action ("Motion") the next day.  ECF No. 2.

## LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023) (citation omitted).  Such relief is warranted only if the movant establishes "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Big Tyme Invests., L.L.C. v. Edwards*, 985 F.3d 456, 463-64 (5th Cir. 2021).  The same requirements apply to a temporary restraining order, *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011), as well as relief under 5 U.S.C. § 705, *see Career Colleges & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255-56 (5th Cir. 2024) (postponing the effective date of a Rule under § 705 after finding the preliminary injunction factors had been satisfied).  And preliminary relief should be denied if the movant fails to sufficiently establish "*any* one of the four" requirements.  *Anibowei*, 70 F.4th at 905 (citation omitted).

## ARGUMENT

Plaintiffs seek to postpone the effective date of the entire Rule, *see* 5 U.S.C. § 705, and they

---

§ 1396a(a)(19) (requiring the Medicaid State plan to "provide such safeguards as may be necessary to assure that" covered services are provided "in a manner consistent with . . . the best interests of the recipients"); *id.* § 1397aa(a) (permitting the provision of funds to States to "enable them to initiate and expand the provision of child health assistance to uninsured, low-income children in an effective and efficient manner"); *see also* 89 Fed. Reg. at 37,668.

also request a temporary restraining order and preliminary injunction enjoining Defendants from "interpreting or enforcing" § 1557, the SSA, or "any implementing regulations" to prohibit discrimination "based on sexual orientation or gender identity" or to require "performance of (or insurance or other coverage of) abortions or gender-transition procedures or treatments." Proposed Order, ECF No. 2-3. Yet the only basis for this sweeping relief that Plaintiffs raise in their Motion is that the Rule, according to them, unlawfully "reinterprets Title IX's prohibition of discrimination 'on the basis of sex'"—which § 1557 directly incorporates—"to include discrimination on the basis of 'gender identity.'" Motion at 1. They do not challenge any of the Rule's provisions that do not concern sex discrimination specifically. Nor do they meaningfully challenge the lawfulness of prohibiting discrimination on any grounds other than gender identity.[8] And even as to the Rule's prohibition on gender identity discrimination, Plaintiffs appear to challenge the Rule only to the extent it would purportedly "compel physicians, hospitals, and States to perform and pay for" gender-transition procedures. Motion 1; *see id.* 6 ("HHS exceeded its statutory authority when it promulgated the Final Rule, which attempts to codify a legal duty to perform 'gender-affirming' medical activities as a condition of receiving federal funds.").[9]

Given the narrow scope of Plaintiffs' arguments, it would thus "be improper to enjoin portions of the Rule that are unchallenged or for which [Plaintiffs] ha[ve] not shown a likelihood of success on the merits." *Career Colleges*, 98 F.4th at 255-56. And here, Plaintiffs' Motion, even if broadly construed, implicates only those provisions or facets of the Rule that concern discrimination on the

---

[8] Plaintiffs' Proposed Order mentions "abortions" and "discrimination based on sexual orientation," ECF No. 2-3, but neither issue is addressed in their Motion. *See City of Austin v. Kinder Morgan Tex. Pipeline, LLC*, 447 F. Supp. 3d 558, 568 n.7 (W.D. Tex. 2020) (noting that an argument not raised in a movant's brief "had been waived" for purposes of deciding a preliminary injunction motion).

[9] A corollary of Plaintiffs' objection to the Rule's prohibition against discrimination on the basis of gender identity is that health care providers and health insurance issuers should be permitted to deny care or coverage—including treatment for an ear infection, broken bone, or cancer—to an individual simply because he or she is transgender. *See, e.g.*, 45 C.F.R. § 92.206(b)(1) (prohibiting the denial of "health services . . . to an individual based upon the individual's . . . gender identity"). Defendants assume Plaintiffs would not endorse such overt animus. Nonetheless, this point highlights the problematic nature of the sweeping relief Plaintiffs seek here, which would presumably prohibit enforcement of § 1557's nondiscrimination protections even in the circumstances just described.

7

basis of gender identity.  The Court's analysis and any potential relief should therefore be limited only to those specific provisions.  Furthermore, whether Plaintiffs are even entitled to that far more limited relief principally hinges on a single legal question—namely, whether the Rule, by prohibiting discrimination "on the basis of . . . [g]ender identity," 45 C.F.R. § 92.101(a)(2)(iv), is contrary to § 1557's prohibition of discrimination "on the basis of sex."  20 U.S.C. § 1681(a); *see* 42 U.S.C. § 18116(a) (barring discrimination "on the ground prohibited under . . . Title IX").  It is not.  Plaintiffs are therefore unlikely to succeed on the merits of their challenge to the Rule.  They also fall well short of satisfying the other requirements for obtaining preliminary relief.

## I.      Plaintiffs Are Not Likely To Succeed on the Merits

Plaintiffs contend that they are entitled to preliminary relief because (1) HHS exceeded its statutory authority by issuing a Rule that interprets § 1557's prohibition of sex discrimination as encompassing discrimination on the basis of gender identity; (2) the Rule's prohibition against gender identity discrimination is arbitrary and capricious; and (3) the Rule's "gender-transition mandate" is unconstitutional.  Motion at 6-14 (citing 5 U.S.C. § 706(2)).  All three arguments lack merit.

### A.      The Rule's Prohibition of Discrimination on the Basis of Gender Identity Is Consistent with § 1557 and Does Not Exceed Statutory Authority

Plaintiffs first argue that HHS, in promulgating a Rule providing that discrimination on the basis of sex under § 1557 includes discrimination on the basis of gender identity, "exceeded its statutory authority."  Motion at 6.  They suggest as a threshold matter that HHS lacks authority "to define '[d]iscrimination . . . on the basis of sex.'"  *Id.* at 7.  But the ACA expressly authorizes the Secretary of HHS to "promulgate regulations to implement" § 1557's nondiscrimination requirements.  42 U.S.C. § 18116(c).  And the Rule, by clarifying what constitutes "[d]iscrimination on the basis of sex" in the context of federally funded "health program[s] [and] activit[ies]," 45 C.F.R. § 92.101(a)(1)-(2), serves that very objective.

The crux of Plaintiffs' exceeds-statutory-authority theory boils down to the argument that the Rule's prohibition of gender identity discrimination, 45 C.F.R. § 92.101(a)(2)(iv), is contrary to § 1557 because the latter's "prohibition on sex-based discrimination is limited to biological sex" alone.

Motion at 8.  Yet the Supreme Court explained in *Bostock*, 590 U.S. 644 (2020), that "discrimination based on . . . transgender status necessarily entails discrimination based on sex," *id.* at 669, and that reasoning squarely applies to § 1557's prohibition on sex discrimination. [10]

Bostock addressed whether Title VII's provision making it unlawful for an employer "to discriminate against any individual . . . because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), prohibits an employer from firing someone "merely for being . . . transgender." *Bostock*, 590 U.S. at 683.  The Supreme Court answered that question in the affirmative, concluding in relevant part that "[w]hen an employer fires an employee for being . . . transgender, it necessarily and intentionally discriminates against that individual in part because of sex." *Id.* at 665.  "[P]roceed[ing] on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and female," the Court explained that Title VII's "because of . . . sex" language plainly "incorporates the simple and traditional standard of but-for causation," meaning that the statute is violated whenever an employer "intentionally fires an individual employee based in part on sex." *Id.* at 655, 657, 659.  The Court then concluded that firing an employee for being transgender violates Title VII too because "it is impossible to discriminate against a person for being . . . transgender" without also "discriminating against that individual based on sex." *Id.* at 660; *see id.* at 660-61 ("[T]ransgender status [is] inextricably bound up with sex.").  The Court explained by way of illustration that if an employer fires a transgender woman for being transgender, that employer "intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660.  "[T]he individual employee's sex" thus "plays an unmistakable . . . role in the discharge decision." *Id.*  And that "rel[iance] in part on an individual employee's sex," according to the Court, is precisely what Title VII prohibits. *Id.* at 659.

Bostock's reasoning applies with equal force to § 1557.  The statute prohibits in relevant part "discrimination under[] any health program or activity" "on the ground prohibited under . . . [T]itle IX," 42 U.S.C. § 18116(a), and Title IX prohibits discrimination "on the basis of sex," 20 U.S.C.

---

[10] The terms "gender identity" and "transgender status" "are often used interchangeably."  89 Fed. Reg. at 37,556.  *See also Bostock*, 590 U.S. at 686 n.6 (Alito, J., dissenting).

§ 1681(a).   And because "discrimination based on . . . transgender status necessarily entails discrimination based on sex," *Bostock*, 590 U.S. at 669, § 1557's prohibition on sex-based discrimination necessarily prohibits discrimination on the basis of gender identity as well.  The latter form of discrimination, in short, "cannot happen without" the former.  *Id.* at 669.  Indeed, just like firing an employee for being transgender necessarily involves taking that employee's sex into account, a surgeon who refuses to perform a medically necessary procedure on a transgender man (i.e., an individual who was assigned female at birth but has a male gender identity) that the surgeon would otherwise perform on a patient who was assigned male at birth "unmistakabl[y] and impermissibl[y]" denies an essential medical service based in part on a patient's sex.  *Id.* at 660.  The Rule's prohibition of gender identity discrimination is therefore wholly consistent with § 1557's nondiscrimination provision.

Plaintiffs assert that "*Bostock* does not apply to Section 1557" because *Bostock* specifically addressed Title VII while § 1557 references Title IX, and they accuse the Rule of "conflat[ing]" the former statute's "because of . . . sex" language with the latter's "on the basis of sex" language.  Motion at 9.  But Plaintiffs offer no explanation for how "because of . . . sex" is materially different from "on the basis of sex."  *See Bostock*, 590 U.S. at 654, 662, 664, 666 (using "because of" and "on the basis of" interchangeably); *see also Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992) (explaining that "[w]hen a supervisor harasses a subordinate *because of* the subordinate's sex," the supervisor "'discriminate[s]' *on the basis of sex*" under Title IX (emphasis added) (citation omitted)).  Nor do they explain why *Bostock*'s textual analysis of Title VII's nondiscrimination provision cannot inform the meaning of materially identical language used in another nondiscrimination statute like § 1557.

Plaintiffs further note that Title VII and Title IX are different statutes that apply in "different contexts."  Motion at 9.  Yet the fact that Title VII concerns employment while Title IX concerns discrimination in education programs says nothing about whether, as a matter of text and logic, discrimination "because of" or "on the basis of" sex necessarily encompasses discrimination based on gender identity.  *See Bostock*, 590 U.S. at 659-62 (explaining that *Bostock*'s "straightforward rule" regarding discrimination based on transgender status "emerges" from the "ordinary public meaning"

10

of the statutory text); *see also Lowrey v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 252 n.18 (5th Cir. 1997) (stating that Title IX's anti-retaliation provision "is similar to those of title VII and the ADEA and should be accorded a similar interpretation"). Moreover, courts, including the Fifth Circuit, routinely look to interpretations of Title VII to inform Title IX. *See, e.g., Franklin*, 503 U.S. at 75 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986), a Title VII case, in analyzing a Title IX claim); *Cardner v. Continental Airlines, Inc.*, 636 F.3d 172, 180 (5th Cir. 2011) ("[T]his court has interpreted Title IX as being intended to prohibit a wide spectrum of discrimination . . . in the same manner as Title VII."). And other courts have expressly concluded that *Bostock*'s reasoning applies to § 1557. *See Kadel v. Folwell*, 100 F.4th 122, 163-64 (4th Cir. 2024); *Doe v. Snyder*, 28 F.4th 103, 113-14 (9th Cir. 2022).

Addressing Title IX specifically, Plaintiffs assert that the statute's "text, structure, and purpose" show that it was "intended to prohibit sex discrimination on the basis of *biological* differences between males and females." Motion at 7 (quoting *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 687 (N.D. Tex. 2016)). But *Bostock*'s conclusion that "discrimination based on . . . transgender status necessarily entails discrimination based on sex," 590 U.S. at 669, presumed that very same understanding of what "sex" means. *See id.* at 655 ("[W]e proceed on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and female."). And to the extent Plaintiffs invoke Congress's intentions when enacting Title IX, *see* Motion at 7, the *Bostock* Court disposed of near-identical arguments in relation to Title VII. *See id.* at 653 ("Those who adopted the Civil Rights Act might not have anticipated their work would lead to this particular result."); *id.* at 683 ("Judges are not free to overlook plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork about expectations.").

Plaintiffs' remaining arguments about the Rule's alleged incompatibility with § 1557 fare no better. They claim that § 1557 "incorporated *all* of Title IX by reference," including "numerous separate provisions . . . that allow for sex-based distinctions," thereby "confirming" that § 1557's "prohibition on sex-based discrimination is limited to biological sex." Motion at 8. Plaintiffs misread § 1557's plain text, which expressly incorporates only "the ground prohibited under" Title IX— namely, sex, *see* 20 U.S.C. § 1681—and Title IX's "enforcement mechanisms," 42 U.S.C. § 18116(a);

*see* 20 U.S.C. § 1682.  If § 1557 incorporates Title IX in its entirety, there would have been no need to include the latter language.  *See Nastase v. Barr*, 964 F.3d 313, 317 (5th Cir. 2020) ("[W]hen interpreting a statute, it is necessary to give meaning to all its words and to render none superfluous.").  In any event, whatever the "separate provisions" in Title IX that Plaintiffs invoke, *see* Motion at 7, say about the scope of liability under that statute, those provisions do not require dispensing with *Bostock*'s reasoning that, as a textual matter, "discrimination based on . . . transgender status necessarily entails discrimination based on sex."  590 U.S. at 669.

Plaintiffs additionally claim that § 1557 cannot encompass gender identity discrimination because the statute incorporates the Rehabilitation Act's prohibition on disability discrimination, *see* 29 U.S.C. § 794, and the Rehabilitation Act defines "disability" to exclude "transsexualism" and "gender identity disorders not resulting from physical impairments," *see id.* § 705(20)(F)(i).  *See* Motion at 9-10.[11]  Yet even accepting this argument at face value, that an individual asserting discrimination on the basis of gender identity may not have a cause of action under the Rehabilitation Act in no way precludes that individual from having a cause of action under a separate statute that prohibits sex-based discrimination.  Put another way, § 1557 protects gender identity discrimination precisely because it prohibits discrimination on the basis of sex, irrespective of what the Rehabilitation Act says about disability discrimination.

**B.    The Revised CMS Regulations Do Not Exceed Statutory Authority**

Plaintiffs' separate argument that HHS exceeded its authority under the SSA by revising via the Rule certain nondiscrimination provisions found in CMS regulations governing Medicaid and CHIP, *see id.* at 10-11, should likewise be rejected.  As a general matter, those regulations prohibit discrimination on the basis of race, color, national origin, disability, or sex in Medicaid and CHIP enrollment and require that state Medicaid and CHIP programs, and their contracted managed care plans, also prohibit such discrimination.  42 C.F.R. §§ 438.3(d)(4), 440.262, 457.495(e).  The Rule

---

[11] It should be noted that one court of appeals has held that gender dysphoria does not qualify as a "gender identity disorder[] not resulting from physical impairments" and thus qualifies as a covered disability under the Americans with Disabilities Act and the Rehabilitation Act.  *Williams v. Kincaid*, 45 F.4th 759, 765-772 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2414 (2023).

revises the regulations in relevant part to clarify that discrimination on the basis of sex "includ[es]" discrimination on the basis of gender identity.  *Id.*

Medicaid and CHIP are joint federal-state programs that enable States to extend medical coverage to certain low-income adults and children.  *See* 42 U.S.C. § 1396, *et seq.*; *id.* § 1397aa, *et seq.* To participate in either program, a state must create a plan that fulfills specific statutory conditions, *see* 42 U.S.C. § 1396a(a); 42 U.S.C. §§ 1397aa-1397bb, and then submit that plan to HHS for approval. *Id.* § 1396a(b); *id.* § 1397ff(a)-(c); 42 C.F.R. § 457.150(a)-(c).  And upon approval, States administer their plans, and the federal government provides funding to help defray costs.

There is no dispute here that HHS, through CMS, may establish conditions on federal funding, including conditions prohibiting recipients from discriminating based on certain protected characteristics.  *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022).  Nor is it disputed that CMS has the authority to ensure that state Medicaid and CHIP programs receiving federal funds are administered properly and efficiently, 42 U.S.C. § 1396a(a)(4), operate in a manner "consistent with . . . the best interests of the recipients," *id.* § 1396a(a)(19), and provide child health assistance effectively and efficiently, *id.* § 1397aa(a).  *See* 42 U.S.C. § 1302(a).  There should likewise be no dispute that the revised nondiscrimination requirements in the Rule advance these very goals. By clarifying, consistent with *Bostock*, that sex discrimination includes gender identity discrimination, the revised CMS regulations facilitate covered entities' understanding of their nondiscrimination obligations under Medicaid and CHIP.  *See* 89 Fed. Reg. at 37,668.  And by ensuring that "access to care and services" is "provided in a non-discriminatory manner," *id.*, the revised regulations are also wholly consistent with the "best interests" of beneficiaries, *see* 42 U.S.C. § 1396a(a)(19).  HHS was thus well within its authority to promulgate them.

## C.     The Rule Is Not Arbitrary and Capricious

Plaintiffs' contention that the Rule "is arbitrary and capricious in several ways," Motion at 12, likewise lacks merit.  The APA's arbitrary and capricious standard is "highly deferential" and "focuses on whether an agency articulated a rational connection between the facts found and the decision made."  *Frey v. U.S. Dep't of Health & Human Servs.*, 920 F.3d 319, 326 (5th Cir. 2019).  A reviewing

13

court cannot "substitute [its] judgment for the agency's." *Healthy Gulf v. U.S. Army Corps of Eng'rs*, 81 F.4th 510, 520 (5th Cir. 2023). Rather, "the role of courts in reviewing arbitrary and capricious challenges is to simply ensure that the agency has acted within a zone of reasonableness." *Biden v. Missouri*, 595 U.S. 87, 96 (2022) (citation omitted).

As with their exceeds-statutory-authority theory, Plaintiffs' arbitrary and capricious theory focuses exclusively on the Rule's prohibition of gender identity discrimination, and their distorted characterizations of that prohibition simply cannot be squared with the Rule's plain text. Contrary to Plaintiffs' assertion that the Rule will require health care providers "to ignore the medical and biological differences between the sexes," Motion at 12, the Rule acknowledges that "sex has biological components" and that "knowledge of an individual's biological attributes is an essential component of providing high quality health care." 89 Fed. Reg. at 37,575; *see also id.* at 37,593 ("Not all differential treatment on the basis of sex constitutes unlawful discrimination under section 1557, and the final rule does not prohibit all differential treatment."). And contrary to Plaintiffs' assertions that the Rule will "undermine sound medical treatment" and prevent providers from "using their reasonable medical judgment," Motion at 12, the Rule expressly provides that care and treatment decisions comply with the Rule so long as they are based on a "legitimate, nondiscriminatory reason," including where a health care provider "reasonably determines" that a particular service is "not clinically appropriate for a particular individual." 45 C.F.R. § 92.206(c); *see* 89 Fed. Reg. at 37,607 ("[T]his final rule would not prohibit a covered entity from denying coverage for preventive health services for a transgender patient where such care is not medically necessary . . . ."). The assertion that HHS "failed to consider the negative effect" of certain treatments, Motion at 13, misses the mark for the same reasons.

Plaintiffs additionally claim that HHS failed to offer a "reasoned explanation" of the Rule's "departure from the historic understanding of 'sex' as used in Title IX." Motion at 12. But the Rule does not "depart" from any prior understanding of "sex"; it simply recognizes that, as explained in *Bostock*, discrimination on the basis of sex necessarily encompasses gender identity discrimination. 590 U.S. at 660-61. And the Rule in any event explains that its prohibition of gender identity discrimination is "strong[ly] support[ed]" by *Bostock* and other case law, 89 Fed. Reg. at 37,574, and will help combat

14

the "well[-]documented" discrimination that transgender individuals can face when accessing health care and coverage, *id.* at 37,577.  Plaintiffs also object to HHS's determination that it was "not necessary" to define "sex" in the Rule, *see id.* at 37,575, yet ignore HHS's subsequent—and reasoned—explanation for doing so.  *See id.* (explaining that *Bostock* did not define the term "sex" either and proceeded on the assumption that sex encompasses "biological distinctions between male and female" and noting that the Rule provides a "non-exhaustive list" of what constitutes sex discrimination); *see also Healthy Gulf*, 81 F.4th at 520 (requiring that an agency only "articulat[e] a satisfactory explanation for its decision").  Such an objection is also beside the point—Plaintiffs' only challenge in their Motion is to the Rule's prohibition on gender identity discrimination, and nowhere do they contend that HHS arbitrarily failed to explain what discrimination on that basis means.

Lastly, Plaintiffs accuse HHS of failing to "adequately consider the disproportionately negative impact" on women and girls of the Rule's prohibition on gender identity discrimination.  Motion at 13.  Yet they do not explain what that purportedly "negative impact" entails, and, in any event, the Rule also expressly prohibits discrimination against women, *see* 45 C.F.R. § 92.101(a)(1).

## D.    The Rule Is Not Contrary to the Constitution

Finally, Plaintiffs offer two reasons why the Rule is purportedly "contrary to constitutional right," 5 U.S.C. § 706(2)(B), neither of which succeed.  First, they claim that the Rule's so-called "gender-transition mandate" implicates the "major questions doctrine."  Motion at 13.  Again, though, Plaintiffs mischaracterize the Rule, which does not "require [the] provision of particular procedures" nor "mandate coverage of any particular care," whether gender-affirming or not.  89 Fed. Reg. at 37,533.  The major questions doctrine, moreover, is not a standalone constitutional claim but rather describes an interpretive approach that "counsels skepticism" in "certain extraordinary cases" involving an agency's assertion of "highly consequential power beyond what Congress could reasonably be understood to have granted."  *West Virginia v. EPA*, 597 U.S. 697, 723-24, 732 (2022).  And nothing in the Rule implicates that doctrine here.  HHS does not contend that Congress gave it authority to decide as a matter of policy whether § 1557 prohibits discrimination based on gender identity.  Instead, as the Supreme Court explained in *Bostock*, the Rule's references to such

discrimination reflects "policy decisions" made "by Congress . . . itself" in § 1557's text. *West Virginia*, 597 U.S. at 723 (citation omitted); *see Bostock*, 590 U.S. at 683 (explaining that the Court's conclusion was "a necessary consequence" of the "broad language" that "*Congress adopted*" (emphasis added)). Accordingly, just as the Supreme Court did not invoke the major questions doctrine when it endorsed EEOC's interpretation of Title VII in *Bostock*, there is no basis for invoking it here either.

Second, Plaintiffs contend that the Rule is "unconstitutionally coercive" because it "force[s]" States to comply with its provisions "under threat of the loss of all federal healthcare funds," Motion at 14, but this argument lacks merit as well.  "Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds," which includes the authority to "prohibit[] recipients of federal financial assistance from discriminating based on certain protected characteristics." *Cummings*, 596 U.S. at 216.  Such conditions on federal funds are lawful so long as "a State has a legitimate choice whether to accept the federal conditions in exchange for federal funds." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012) ("*NFIB*").  And since the ACA's enactment, Plaintiffs have chosen to continue to accept funds from HHS while knowing that violations of § 1557's nondiscrimination requirements, including its prohibition on sex-based discrimination, could potentially result in some of those funds being withheld.  *See* 42 U.S.C. § 18116(a) (expressly incorporating Title IX's "enforcement mechanisms"); 20 U.S.C. § 1682.  The Rule, which merely clarifies § 1557's scope in light of *Bostock*, does nothing to change the essential terms of that choice. *See Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("[S]o long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely."); *see also Bostock*, 590 U.S. at 680 (explaining that the Court's holding that Title VII prohibits firing employees on the basis of sexual orientation or transgender status "has never hidden in a mousehole; it has been standing before us all along").

Plaintiffs cite *NFIB*, the lone Supreme Court case to have found a condition on federal funds to be unconstitutionally coercive, as support for their claim that the Rule impermissibly imposes a "new" and "coercive" condition requiring Texas and Montana to "provide 'gender-affirming' treatments in violation of state law."  Motion at 14.  Yet the Rule does nothing of the sort.  Nowhere

does it require covered entities to provide specific types of care; it simply prohibits care and coverage decisions that are "based on unlawful animus or bias."  45 C.F.R. § 92.206(c); *id.* § 92.207(c).  Nor does the Rule impose "new" conditions; indeed, before the Rule, § 1557 prohibited recipients of federal funds from discriminating on the basis of sex—which, as *Bostock* explained, necessarily encompasses discrimination on the basis of transgender status as well, 590 U.S. at 660-61—and the statute will still prohibit such discrimination after the Rule becomes effective.[12]  Because § 1557's nondiscrimination requirements, including its prohibition on gender identity discrimination, are nothing like the dramatic and atypical conditions at issue in *NFIB*, *see* 567 U.S. at 579, 584 (noting that the conditions in question were "far from the typical case" and were designed to "dramatically" transform the Medicaid program), that one-of-a-kind case is inapplicable here.

A final point: Plaintiffs suggest that Spending Clause legislation cannot "preempt state law," but rather "can only *induce* States to change their own laws."  Motion at 14.  They offer no support whatsoever for this proposition.  And they are wrong as a legal matter.  Valid Spending Clause legislation is entitled to full preemptive force under the Supremacy Clause.  U.S. Const. art. VI, cl. 2.  The Supreme Court has thus consistently applied ordinary preemption principles to spending legislation, even where a State is not the recipient of federal funds.  *See, e.g.*, *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95-99 (2017); *Bennett v. Arkansas*, 485 U.S. 395, 396 (1988) (per curiam).

## II.    Plaintiffs Fail To Show Imminent Irreparable Harm

Plaintiffs' failure "to establish that there is a substantial likelihood that [they] will prevail on the merits" is sufficient on its own to deny their request for preliminary relief.  *PCI Transp., Inc. v. Forth Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).  Yet Plaintiffs also fail to establish that they will suffer an injury as a result of the Rule that is sufficiently imminent and irreparable to warrant the extraordinary relief they seek.

---

[12] To the extent Plaintiffs' "constitutional" claim alleging coercive funding conditions hinges on their argument that the Rule unlawfully applies *Bostock* to § 1557, such a claim is indistinguishable from their statutory APA claim and should therefore be rejected.  *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) ("[I]t is a well-established principle . . . that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.").

"Because a preliminary injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief,'" a plaintiff seeking one must "make a 'clear showing' that they have standing." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  Additionally, a preliminary injunction "should not issue absent a substantial threat that the movant will suffer irreparable injury without one." *Google, Inc. v. Hood*, 822 F.3d 212, 226 (5th Cir. 2016).  Preliminary relief is thus warranted only if a plaintiff demonstrates "the presence of an imminent, non-speculative irreparable injury." *Id.* at 228; *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (noting that an injury sufficient for standing must be "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical'" (citation omitted)). "Allegations of *possible* future injury" or a "subjective fear" of future government action "are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 418 (2013) (cleaned up); *see FDA v. All. for Hippocratic Med.*, No. 23-235, slip op. at 8 (U.S. June 13, 2024) ("[T]he injury must have already occurred or be likely to occur soon").  And even if an asserted injury arguably confers standing, preliminary relief should still be denied if that injury is not likely to materialize "before a decision on the merits can be rendered." *Winter*, 555 U.S. at 22 (citation omitted).

Here, Texas and Montana assert a variety of possible future injuries that the Rule will purportedly cause, but none amounts to imminent irreparable harm.  Accordingly, whether analyzed as a matter of irreparable harm, *Google*, 822 F.3d a 226; standing, *see Clapper*, 568 U.S. at 409; ripeness, *see Google, Inc.*, at 225-26; or statutory preclusion of pre-enforcement jurisdiction, *see Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-18 (1994), Plaintiffs' demand for sweeping preliminary relief fails.

Texas and Montana first assert that they have standing to challenge the Rule because the Rule, "[b]y its own terms," regulates both States.  Motion at 3.  The mere existence of a statute or rule on the books, however, cannot itself amount to an injury in fact, let alone an irreparable one; a plaintiff must still "assert an injury that is the result of a statute's actual or threatened *enforcement*." *California v. Texas*, 593 U.S. 659, 670 (2021).  Plaintiffs contend that HHS might find certain health programs that each State administers to be noncompliant with the Rule and that they "*may . . .* lose their federal funding as a result."  Motion at 3 (emphasis added); *see id.* at 4 ("Texas faces losing billions of dollars

18

in federal healthcare dollars."); *id.* at 5 (claiming that the Rule "unlawfully threatens to subject Montana to . . . withdrawal of federal funding"). But this fear of "*possible* future injury," Clapper, 568 U.S. at 409, is far too speculative to warrant preliminary relief.

To start, neither Plaintiff claims that any of the policies or provisions governing the health programs they administer are "based on unlawful animus or bias, or constitute a pretext for discrimination," which is what the Rule actually prohibits. 45 C.F.R. § 92.207(c); *see id.* 45 C.F.R. § 92.206(c); *cf. Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) (explaining that a plaintiff lacked standing because he "failed to establish a serious intention to engage in conduct proscribed by [the] law" he was challenging). Plaintiffs suggest that some of their laws and Medicaid policies that bar the provision of and coverage for certain gender-affirming care will qualify as "discrimination" under the Rule. Motion at 4. But Plaintiffs simply assume that their policies are noncompliant while simultaneously arguing that there are "legitimate, nondiscriminatory reasons" for such policies, 45 C.F.R. § 92.207(c). *See, e.g., id.* at 5 (asserting that Montana is "attempting to protect its citizens from harmful medical procedures"); Compl. ¶ 1 (alleging that Plaintiffs "refuse to provide or pay for dangerous and experimental 'gender-transition' medical activities"). Any threat of future enforcement is therefore "wholly conjectural" at this stage. *Susan B. Anthony List*, 573 U.S. at 163 (citation omitted).

Even assuming for the sake of argument that OCR might, at some point, investigate whether one of Texas's or Montana's health programs is potentially not compliant with the Rule, HHS would still be obligated to "secure[]" Plaintiffs' compliance "by voluntary means" before resorting to a termination of federal funds. 20 U.S.C. § 1682; *see* 45 C.F.R. § 80.8(d).[13] And such compliance at any point during the investigative or enforcement process would preclude OCR from terminating Plaintiffs' funds. *See* 45 C.F.R. § 80.7(d)(1) (providing that if an investigation "indicates a failure to comply," the matter "will be resolved by informal means whenever possible"); *id.* § 80.10(f) (permitting a recipient to "correct[] its noncompliance" to avoid a loss of funding even after a hearing examiner

---

[13] Contrary to what Plaintiffs claim, merely having to cooperate with OCR during this process does not "itself inflict[] injuries," Motion at 3. *See FTC v. Standard Oil Co. of Cal*, 449 U.S. 232, 244 (1980) ("Mere litigation expense, even [if] substantial . . . does not constitute irreparable injury.").

has found noncompliance); *see also id.* § 80.10(g)(1) (providing that a recipient subjected to an adverse administrative order "shall be restored to full eligibility" to receive federal funding as soon as "it brings itself into compliance").  Consequently, even a future investigation by OCR would by no means yield the financial injury Plaintiffs allege.  *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) (stating that "[s]peculative injury is not sufficient" to establish "a clear showing of irreparable harm").  And even supposing OCR did seek to withhold funding for noncompliance, the extensive procedures, culminating in judicial review, that § 1557 requires before any such decision can take effect practically guarantees that Plaintiffs' alleged financial injury here would not materialize "before a decision on the merits can be rendered."  *Winter*, 555 U.S. at 22 (citation omitted).

Plaintiffs' asserted fear of potentially losing federal funding under the Rule does not warrant preliminary relief here for many of the reasons described in *Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016).  In that case, the Fifth Circuit vacated a preliminary injunction enjoining Mississippi's Attorney General from bringing civil or criminal charges against Google for "facilitating dangerous and unlawful activity through its online platforms" in violation of state law because "the possibility of some future enforcement action," according to the court, failed to "create[] an imminent threat of irreparable injury."  822 F.3d at 216, 228.  As with Plaintiffs here, Google had not received "a formal notice of intent to sue for specific conduct."  *Id.* at 227.  The court thus explained that "adjudicating whether federal law would allow an enforcement action" against Google would "require [the court] to determine the legality of" Mississippi's actions "in hypothetical situations," *id.* (citation omitted)—a problem that applies to this case as well.  Accordingly, because OCR, like Mississippi in *Google, Inc.*, would have "to gather considerable information" from Plaintiffs about their legitimate, nondiscriminatory bases for their policies "before [it could] determine whether an enforcement action is warranted," the "prospect of" an enforcement action under the Rule—let alone any withholding of funding—"is not sufficiently imminent or defined to justify an injunction" here.  *Id.* at 228.

Plaintiffs also assert that certain "required expenditures to demonstrate compliance with" the Rule constitute an injury sufficient for both standing and preliminary relief.  Motion at 3-4; *see id.* at 14.  But Plaintiffs make no effort to describe—let alone "clearly show[]" *Barber*, 860 F.3d at 355—

what those purported compliance costs are.  Nor do they demonstrate that such costs are traceable to the parts of the Rule they actually challenge.  *Cf. California*, 593 U.S. at 678 (finding no standing where certain "additional costs" were imposed by statutory provisions other than the one the plaintiffs were challenging).  For instance, even if Plaintiffs succeed on their claim that § 1557 does not prohibit discrimination on the basis of gender identity, they would still be obligated to implement written policies addressing other forms of discrimination (e.g., race, disability, etc.) and to provide training on those policies.  *See* 45 C.F.R. §§ 92.8-.9.  Many of the Rule's compliance provisions, moreover, have a delayed effective date, meaning Plaintiffs very likely would not incur any related compliance costs "before a decision on the merits is rendered" in this case.  *Winter*, 555 U.S. at 22 (citation omitted).  *See* 45 C.F.R. § 92.1(b) (providing that the effective date for § 92.8, which describes the "written policies and procedures" requirement, is "[w]ithin one year of July 5, 2024").

In addition to their alleged financial injuries—none of which are sufficiently imminent to warrant preliminary relief—Plaintiffs contend that the Rule will cause them to "face an imminent, irreparable, sovereign injury," Motion at 4, the precise contours of which are difficult to discern.  Texas and Montana both cite to their respective state laws prohibiting the provision of gender-affirming care to minors and state-funded insurance coverage for such care, and Texas also cites an exclusion for "[s]ex change operations" in its Medicaid program.  *Id.* at 4-5.  But to the extent Plaintiffs merely contend that these laws and policies will be deemed noncompliant with the Rule and therefore result in a loss of federal funds, *see id.* at 4 (claiming that "Texas faces losing billions of dollars in federal healthcare dollars"), that theory of injury is indistinguishable from and just as speculative as their financial injury theory.  *See id.* at 3-4.  And to the extent they argue that the Rule will irreparably "prevent[]" them "from enforcing [their] laws," *id.* at 5, the Rule does no such thing.  The Rule does not mandate "a specific standard of care or course of treatment for any individual," 89 Fed. Reg. at 37,595, nor does its mere promulgation automatically affect state laws regulating the provision of medical care or health insurance.  The Rule simply requires that covered entities provide such care or coverage in a nondiscriminatory manner, *see* 45 C.F.R. 92.101(a), and any restrictions on certain medical care or exclusions from coverage mandated by state law will comply with the Rule so long as

there are "legitimate, nondiscriminatory reason[s]" for them, *id.* §§ 92.206(c), 92.207(c). Accordingly, Texas and Montana will not be "hindered from enforcing [their] laws" under the Rule, *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 770 (5th Cir. 2023) (finding no standing in part because "no . . . challenge to the enforceability of Louisiana's law [was] present"), unless and until it is determined that any such law is "based on unlawful animus or bias," or "constitute[s] a pretext for discrimination," § 92.206(c).[14]  The sovereign injury Plaintiffs invoke is thus neither "actual" nor "imminent." *Susan B. Anthony List*, 573 U.S. at 158.

Montana faces a separate redressability problem. It bases its asserted "sovereign injury" on its belief that the Rule will interfere with its ability to enforce a state statute prohibiting the provision of gender-affirming care to minors and the use of public funds "for the purposes of providing" such treatment. Mont. Code Ann. § 50-4-1004. But that law has been preliminarily enjoined in state court. *See Van Garderen v. Montana*, No. DV-23-541 (Mont. Fourth Jud. Ct. Sept. 27, 2023). Enjoining the Rule here thus "would not remedy" Montana's "alleged injury" because even with such relief, it still would not be able to enforce § 50-4-1004. *Haaland v. Brackeen*, 599 U.S. 255, 292 (2023).

Finally, Texas appears to separately assert that it will be harmed by the Rule in its capacity as a health care provider. *See* Decl. of Eric Bentley ¶¶ 1-2, ECF No. 2-2 (stating that Texas Tech University operates two "health science centers" that are "state of Texas institutions of higher education" and "covered entities" under the Rule).[15]  As a threshold matter, a class-wide declaratory

---

[14] Because the Rule does not, standing alone, "prevent[]" Texas or Montana "from enforcing [their] laws," the cases Plaintiffs cite in support of the proposition that such a sovereign injury "is itself an irreparable harm," Motion at 5, are inapposite. *See, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 602 (2018) (addressing district court orders that "constituted injunctions barring the State from conducting . . . elections pursuant to a statute enacted by the Legislature"); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 409, 419 (5th Cir. 2013) (addressing a district court injunction against a state statute pertaining to the performance of abortions).

[15] Montana does not similarly assert an injury as a health care provider. It therefore fails to show that it will be imminently injured by, and thus has standing to challenge, provisions of the Rule that specifically concern the provision of health care services. *See, e.g.*, 45 C.F.R. § 92.206. Nor does Montana even attempt to explain how it has standing to challenge such provisions on behalf of "healthcare providers" potentially affected by the Rule, Motion at 5. *See Vote.Org v. Callanen*, 39 F.4th 297, 304 (5th Cir. 2022) (describing the requirements for third-party standing and noting that "the Supreme Court has 'not looked favorably upon'" such standing).

judgment in *Neese v. Becerra*, 640 F. Supp. 3d 668 (N.D. Tex. 2022), precludes this particular theory of irreparable harm.  In November 2022, the *Neese* court certified the following class under Federal Rule of Civil Procedure 23(b)(2): "All health-care providers subject to Section 1557 of the Affordable Care Act."  Exhibit 1.  The court also entered final judgment the same day that declares in relevant part that "Section 1557 of the ACA does not prohibit discrimination on account of sexual orientation and gender identity, and the interpretation of 'sex discrimination' that the Supreme Court adopted in [*Bostock*] is inapplicable to the prohibitions on 'sex' discrimination" in Title IX and § 1557.  Exhibit 2.  The Rule accordingly states that HHS "is not applying" the Rule's interpretation of § 1557's prohibition on sex discrimination to include discrimination on the basis of gender identity and sexual orientation "to members of the *Neese* class pending appeal."  89 Fed. Reg. at 37,574 n.118.[16]  Because the *Neese* class includes all health care providers subject to § 1557—including the Texas Tech facilities Texas identifies here—any future harm to those facilities flowing from the Rule's prohibition on gender identity discrimination will only occur if the *Neese* judgment is overturned on appeal.  Such harm is thus too speculative at this stage to warrant preliminary relief.

Texas's provider-based theory of injury also fails on its own terms.  More specifically, Texas avers that the Rule will present the Texas Tech University System with "the impossible choice" of being "threatened with the withdrawal of millions of dollars of healthcare funding unless [it] violate[s] state law."  Motion at 4.  But in addition to the fact that the Rule simply does not require health care facilities to provide certain care, Texas fails to explain how a potential conflict with state law is a cognizable injury that the state can assert *as a healthcare provider* (rather than as a sovereign).  *See Harrison*, 78 F.4th at 770 (describing "federal preemption of state law" as a "sovereign interest").  Regardless, Texas Tech fails to "demonstrate a serious intent to violate" the Rule such that it has standing to challenge it here, *Zimmerman*, 881 F.3d at 389, and as with Texas and Montana, the withdrawal of federal funds Texas Tech fears is too speculative and non-imminent to constitute irreparable injury, *see Google, Inc.*, 822 F.3d at 228.

---

[16] The defendants in *Neese* appealed to the Fifth Circuit, and that appeal is pending.  *See Neese v. Becerra*, No. 23-10078.

III.    **The Equities and the Public Interest Weigh Against a Preliminary Injunction**

The balance of equities and public interest considerations "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tip decidedly against preliminary relief here. As explained in detail above, Plaintiffs have failed to demonstrate that they will suffer any substantial, imminent, and irreparable injury if the Rule goes into effect. Against this non-existent showing of harm weighs the significant public interest in permitting enforcement of the Rule to combat discrimination in health programs and activities receiving federal funds. It is well-established that violations of federal civil rights statutes constitute irreparable harm. *See EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1090 (5th Cir. 1987). And a patient who is denied basic medical care or insurance coverage simply because a provider or issuer wants to intentionally penalize them for being transgender clearly suffers irreparable injury. *See Lange v. Houston Cnty.*, 101 F.4th 793, 801 (11th Cir. 2024). Furthermore, when a law is stayed or enjoined, the government that enacted it "necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Planned Parenthood of Greater Tex.*, 734 F.3d at 419. Enjoining the Rule would inflict that very harm on the federal government here.

IV.    **Any Relief Should Be Limited**

For the reasons explained above, no relief is warranted here. But in the event the Court were to award any relief, such relief should be no broader than necessary to remedy any demonstrated harms Plaintiffs themselves will suffer in this case. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (5th Cir. 2018) (citation omitted).

Consistent with these principles, then, any preliminary relief here should be limited to Plaintiffs alone—that is, Texas and Montana, to the extent they qualify as "covered entities," *see* 45 C.F.R. § 92.4. The Fifth Circuit recently counseled that "judicial restraint" is warranted when crafting injunctive relief, and district courts should consider "whether one district court should make a binding judgment for the entire country." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021). Since then, three Justices

of the Supreme Court concluded that a "district court's universal injunction defied . . . foundational principles" that "a federal court may not issue an equitable remedy 'more burdensome . . . than necessary'" to redress a plaintiff's injuries. *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., joined by Thomas, J. and Alito, J., concurring in the grant of the stay) (citation omitted); *see also Braidwood Mgmt., Inc. v. Becerra*, _F.4th_, No. 23-10326, 2024 WL 3079340, at *15 (5th Cir. June 21, 2024) ("The parties recognize that [universal] injunctions are not 'required or even the norm,' and several [J]ustices on the Supreme Court have viewed them with conspicuous skepticism.").

Plaintiffs' invocation of § 705 of the APA does not change the inadvisability of a remedy that extends to non-parties. That section provides that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. In limiting such relief "to the extent necessary to prevent irreparable injury," *id.*, the statute directs courts to apply traditional equitable principles, which include tailoring relief to be no more intrusive than necessary to prevent irreparable harm *to the parties*. Indeed, the House Report for the APA indicates that relief under § 705 should "normally, if not always, be limited to the parties complainant." *Administrative Procedure Act*, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946).

In addition to being limited to the parties, any relief should be limited to the parts of the Rule that Plaintiffs "*actually challenge*[]." *Career Colleges*, 98 F.4th at 255. And here, Plaintiffs exclusively challenge the Rule's interpretation of § 1557's prohibition on sex discrimination to include discrimination on the basis of gender identity. *See* 45 C.F.R. § 92.101(a)(2)(iv). Crucially, the provisions of the Rule are severable, *id.* § 92.2(c), meaning the Court should, at most, only sever the gender identity discrimination provision "while leaving the remainder" of the Rule "intact." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-29 (2006).

## CONCLUSION

Plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction, and Stay of Agency Action should be denied.

25

DATED: June 27, 2024                     Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         MICHELLE R. BENNETT
                                         Assistant Director, Federal Programs Branch

                                         */s/ Zachary W. Sherwood*
                                         ZACHARY W. SHERWOOD
                                         (IN Bar No. 37147-49)
                                         Trial Attorney
                                         BRADLEY P. HUMPHREYS
                                         Senior Trial Counsel
                                         LISA ZEIDNER MARCUS
                                         Senior Counsel
                                         LIAM C. HOLLAND
                                         JEREMY S.B. NEWMAN
                                         Trial Attorneys
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, NW
                                         Washington, DC 20005
                                         Phone: (202) 616-8467
                                         Fax: (202) 616-8470
                                         Email:  zachary.w.sherwood@usdoj.gov

                                         *Attorneys for Defendants*

### CERTIFICATE OF SERVICE

On June 27, 2024, I electronically submitted the foregoing document with the clerk of court

for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the

court.  I hereby certify that I have served all parties electronically or by another manner authorized by

Federal Rule of Civil Procedure 5(b)(2).

*/s/ Zachary W. Sherwood*