# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| STATE OF TEXAS,<br>STATE OF MONTANA,<br>　　　*Plaintiffs,*<br><br>v.<br><br>XAVIER BECERRA, in his official capacity<br>as Secretary of Health and Human Services;<br>MELANIE FONTES RAINER, in her<br>official capacity as Director of the Office for<br>Civil Rights; CENTERS FOR MEDICARE<br>& MEDICAID SERVICES; UNITED<br>STATES DEPARTMENT OF HEALTH<br>AND HUMAN SERVICES,<br><br>　　　*Defendants.* | Case No. 6:24-cv-00211 |

---

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND STAY OF AGENCY ACTION

---

Defendants' defense hinges entirely on their flawed theory that the Supreme Court's holding in *Bostock* applies to Title IX, and thus to Section 1557. *See* 42 U.S.C. § 18116(a). Defendants argue that the Final Rule's re-writing of statutory terms "flow[s] ineluctably from *Bostock*." Dkt. 15 at 3. But "*Bostock* does not apply to . . . Title IX." *Neese v. Becerra*, 640 F. Supp. 3d 668, 676 (N.D. Tex. 2022) (Kacsmaryk, J.); *see also Texas v. Cardona*, --- F. Supp. 3d.---, No. 4:23-cv-00604, 2024 WL 2947022, at *37 (N.D. Tex. June 11, 2024) (O'Connor, J.). And Defendants concede that, absent the Final Rule's importation of *Bostock* to Title IX, the statute's prohibition on discrimination on the basis of sex extends only to *biological* sex.

Yet, even with that understanding, Defendants seem more concerned with ear infections, *see* Dkt. 15 at 9 n.9, and the micromanaging of state laws that don't fit the Biden Administration's agenda than with protecting America's children from mutilating procedures that will permanently harm them. Indeed, in four days, the Final Rule will require all States and healthcare providers to perform gender-transition procedures on pain of losing all federal funding. There is no dispute that Texas's and Montana's laws and policies violate the Final Rule, *see id.* at 19, or that the result of such a violation is withdrawal of federal funding, *see id.* at 5. But while Defendants coerce compliance, they ask this Court to delay judicial relief so that they may gather evidence to determine whether Texas and Montana have "legitimate, nondiscriminatory bases for their policies." *See id.* at 20. That Defendants have already rendered a guilty verdict only makes preliminary injunctive relief all the more necessary, and a stay all the more warranted.

## Argument

### I.    The Final Rule mandates gender-transition procedures and forbids sex-separated living facilities.

In their Response, Defendants obfuscate the terms of the Final Rule, describing it as a backstop to ensure everyone has access to "treatment for an ear infection, broken bone, or cancer." Dkt. 15 at 9 n.9. This is an egregious mischaracterization of the Final Rule's mandates, which never mention "ear infections" and "broken bones." Instead, it refers to "gender-affirming" and "gender transition" services over 100 times, and it *codifies* a right to them:  No health programs,

"*any part of which is receiving Federal financial assistance*," 89 Fed. Reg. 37,693 (to be codified at 42 C.F.R. § 92.2(c) (emphasis added), may "[h]ave or implement a categorical coverage exclusion or limitation for all health services related to *gender transition* or other *gender-affirming* care." 89 Fed. Reg. 37,701 (to be codified at 42 C.F.R. § 92.206(b)(4)) (emphasis added).[1] In other words, no state or healthcare provider may refuse to pay for or perform "gender transition or other gender-affirming care," and any state law that does is preempted. 89 Fed. Reg. 37,535.

Defendants insist that the Final Rule does not "require specific entities to provide specific types of care," Dkt. 15 at 19, and they point to 89 Fed. Reg. 37,701 (to be codified at 42 C.F.R. § 92.206(c)) to support the proposition that the Final Rule does not dictate a standard of care. *See* Dkt. 15 at 7. But that section only emphasizes Defendants' position that gender-transition procedures are the standard, and deviations are the exception. That section stipulates:

> Nothing in [§ 92.206] requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service, including where the covered entity typically declines to provide the health service to *any* individual or where the covered entity reasonably determines that such health service is not clinically appropriate for *a particular* individual.

89 Fed. Reg. 37,701 (to be codified at 42 C.F.R. § 92.206(c)) (emphasis added). To fall within this safe harbor, States and healthcare providers must refuse to provide, for example, a hysterectomy to treat endometrial cancer if they would deny a hysterectomy "sought for purpose of gender-transition" in order to comply with state law. 89 Fed. Reg. at 37,701 (to be codified at 42 C.F.R. § 92.206(b)(4)). Otherwise, the Final Rule would consider the refusal to pay for or perform a hysterectomy "sought for purpose of gender-transition" an act of "unlawful animus or bias," and construe compliance with state law as "a pretext for discrimination." *See* Dkt. 15 at 7 (quoting 45 C.F.R. § 92.206(c)). If a covered entity denies coverage, OCR requires "the clinical, evidence-based criteria or guidelines relied upon" to support the denial. *See* 89 Fed. Reg. 37,613. The Final

---

[1] Defendants highlight the sweeping application of the Final Rule in their Response. *See* Dkt. 15 at 5 n.6 (recognizing that the Final Rule applies to any "[h]ealth program or activity," including any "venture, or undertaking" that provides "clinical, pharmaceutical, or medical care" or "administer[s] health-related services . . . or other health-related coverage.").

Rule thus makes so-called gender-affirming procedures the standard; deviations require OCR's approval.

The Final Rule further imposes Defendants' gender ideology by interpreting "on the basis of sex" to forbid "any policy or practice" that prevents an individual from being treated "consistent with the individual's gender identity" if it causes the individual more than de minimis harm. 89 Fed. Reg. 37,701 (to be codified at 45 C.F.R. § 92.206(b)(3)). This provision requires hospitals to allow a man who identifies as a woman to share a room with a woman, *see id.* at 37,593 (stipulating that "[a] covered entity will be in violation of this rule if they refuse to . . . place [a transgender person] in facilities consistent with their gender identity, because doing so would result in more than *de minimis* harm")—contrary to Title IX, which explicitly allows "separate living facilities for the different sexes." 20 U.S.C. § 1686; *see Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811–14 (11th Cir. 2022) (en banc). Defendants do not even acknowledge this radical requirement in their Response, choosing instead to hide the ball by downplaying the Final Rule as a simple guarantee that everyone can get treatment for ear infections. *See* Dkt. 15 at 9 n.9.

## II.    The Final Rule is unlawful.

The Final Rule compels States and healthcare providers to pay for and preform gender-transition procedures by redefining discrimination on the basis of sex in Title IX and the Rehabilitation Act to include "gender identity" and "sexual orientation." 89 Fed. Reg. 37,699 (to be codified at 42 C.F.R. § 92.101(a)(2)).

Defendants never meaningfully engage with the text of either statute and instead hinge their entire response on importing *Bostock*'s holding into different statutory schemes. Defendants rely exclusively on *Bostock* to support the gender-transition aspects of the Final Rule. Dkt. 15 at  11. For example, Defendants cite *Bostock* for the proposition that "a surgeon who refuses to perform . . . a procedure on a transgender man . . . unmistakably and impermissibly denies an essential medical service based in part on a patient's sex." Dkt. 15 at 12. But *Bostock* does not apply to Title IX. *See Texas v. Cardona*, 2024 WL 2947022, at *35–36. Defendants support their position by equating "on the basis of sex" (the language used in Title IX) with the "because of . . . sex"

language in *Bostock*'s Title VII, and cite how courts have used the terms interchangeably. Dkt. 15 at 12. But when examining guidance documents issued by the Department of Education that also tried to import *Bostock* to Title IX, Judge O'Connor explained at length why the "language of an opinion is not always to be parsed as though we were dealing with the language of a statute." *Texas v. Cardona*, 2024 WL 2947022, at *38. "[J]ust because a *judicial opinion* employs two phrases interchangeably in one context does not mean *Congress* employed those same terms interchangeably in a different context." *Neese*, 640 F. Supp. 3d at 678 (emphasis in original).

Defendants reject the differences between Title VII and Title IX, arguing that Title VII's application to employment and Title IX's application to education programs "says nothing about whether . . . discrimination 'because of' or 'on the basis of' sex necessarily encompasses discrimination based on gender identity." Dkt. 15 at 12. That Congress enacted different statutes for different contexts matters. "[W]hat counts as discrimination under one statute is not necessarily discrimination under the other." *Texas v. Cardona*, 2024 WL 2947022, at *37. While *Bostock* does not allow employers to consider an employee's sex in hiring or firing decisions, "the comparable logic in the Title IX context would mean that schools could not consider sex to create sports teams," *id.*, and that hospitals or healthcare providers could not consider the biological sex of an individual in making treatment decisions. But this conflicts with Title IX's instructions that it shall not "be construed" as prohibiting receipients "from maintaining separate living facilities for the different sexes," *id.* § 1686. Section 1686 thus highlights that sex separation in contexts where biological differences matter—*e.g.*, dorms, bathrooms, locker rooms, athletics, healthcare— is not discrimination under Title IX.

Further, if Congress meant to impose the conditions of the Final Rule through Title IX or Section 504, it would violate the Major Questions Doctrine's and the Spending Clause's requirement of a clear statement. "Agencies only have those powers given to them by Congress, and enabling legislation is generally not an open book to which an agency may add pages and change the plot line." *West Virginia v. EPA*, 597 U.S. 697, 722–23 (2022); *see also Louisiana v. U.S. Dep't of Educ.*, Civ. A. No. 3:24-cv-563, 2024 WL 2978786, at *13–15 (W.D. La. June 13, 2024) (finding

that the Department of Education's interpretation of "sexual discrimination in Title IX" to include "gender identity, sexual orientation, sex stereotypes, and sex characteristics" involves a matter of vast economic and political significance, requiring the agency demonstrate "clear statutory authorization"). And the "spending power . . . does not include surprising States with post-acceptance . . . conditions." *Nat'l Federation of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012). *Bostock* did not involve an agency interpreting its delegated authority, so this question did not need to be answered there—and *Bostock* expressly held that its interpretation was unexpected. 590 U.S. at 649, 653, 674–81. That holding cannot be reconciled with an argument that Congress spoke clearly on this "unexpected" condition Defendants ask this Court to read into Title IX.

Title IX being a statute enacted pursuant to the Spending Clause makes all the difference because it requires that any ambiguities be interpreted in favor of the States. *See Texas v. Cardona*, 2024 WL 2947022, at *40–42 & n. 135; *Adams*, 57 F.4th at 814–17 (no requisite clear statement in Title IX that States would have to accommodate living facilities based on gender identity). The same is true for Section 1557—Plaintiffs could not have known that Defendants would claim the power to require them to abandon state laws and pay for gender-transition procedures as a condition of funding. As a last refuge, Defendants also rely as authority to enact the Final Rule the general organizing statutes for the agency, Dkt. 15 at 15, but such "broad grants of authority . . . cannot reasonably be construed as assigning decisions of vast economic and political significance," such as the gender-identity mandates of the Final Rule, "to an agency." *Texas v. United States (DAPA)*, 809 F.3d 134, 183 (5th Cir. 2015). Defendants' attempt to import new conditions by redefining what constitutes discrimination on the basis of sex is unlawful.

## III.   The Final Rule will cause irreparable injury.

Defendants' attempt to impose new conditions on Plaintiff States also causes irreparable injury. "To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable," *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). Rather, Plaintiffs need only demonstrate that they are "likely to suffer

irreparable harm in the absence of preliminary relief." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018). The Supreme Court has "long held, parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties.'" *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 600 (2016) (cleaned up).

That Plaintiffs have billions of dollars in federal funds at risk supports the issuance of a preliminary injunction. *See* Dkt. 2-1 at ¶¶ 7–8 (explaining the billions of dollars Texas will lose); *see also* Dkt. 1 at ¶¶ 136–38 (explaining the billions of dollars Montana will lose). Defendants affirm that they may investigate Plaintiffs "[u]pon receiving a complaint *or any other information* indicating . . . noncompliance"—like the declarations and representations Plaintiffs have made here. Dkt. 15 at 4 (citing 45 C.F.R. § 80.7(c) (cleaned up) (emphasis added)). Putting the States "at risk of an often lengthy and arduous investigation" while "at risk of losing their federal funding through an enforcement proceeding" justifies preliminary relief. *State of Tennessee v. Dep't of Educ.*, --- F.4th ---, 2024 WL 2984295, at *17 (6th Cir. June 14, 2024) (Title IX gender-identity mandate).

By "stand[ing] firmly by [their] laws," Plaintiff States will face "administrative and judicial proceedings that could result in the collective loss of billions of dollars in federal funding for noncompliance." *Texas v. Cardona*, 2024 WL 2947022, at *49. And because sovereign immunity prevents Plaintiff States from recovering any loss of money, *Wages & White Lion Invs., LLC v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021); *Texas v. EPA*, 829 F.3d at 434, that injury "cannot be undone through monetary remedies." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012); *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir. 1984).

Setting aside the threat of massive financial penalties, Defendants' misinterpretation of *Bostock*—and insistence on the Final Rule's preemptive effect through the Spending Clause (Dkt. 15 at 17)—requires Plaintiff States to disregard their own laws that ban so-called gender-transition procedures. This harm to the Plaintiff States' sovereign interests likewise supports a preliminary injunction. *See Texas v. Becerra*, 623 F. Supp. 3d 696, 714–19 (N.D. Tex. 2022) (Hendrix, J.). Texas prohibits a physician or healthcare provider from knowingly performing a sterilizing surgery or

mastectomy, or providing puberty blockers or cross-sex hormones, to minors "[f]or the purpose of . . . affirming the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." Tex. Health & Safety Code § 161.702. Similarly, Montana prohibits gender transition procedures for minors, such as chest mastectomies, and it does not pay for such procedures (even prior to SB 99). Dkt. 1 at ¶ 136. And as of today, it still does not pay for those procedures, so the Final Rule would force the state to pay for those procedures. Dkt. 1 at ¶ 136. The Final Rule purports to prohibit Plaintiff States from enforcing these laws even though the regulation of medicine is "a field which the States have traditionally occupied," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), and States have a strong interest "in protecting the integrity and ethics of the medical profession." *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997). Plaintiff States suffers irreparable sovereign injuries when the Final Rule prevents them from enforcing their own duly enacted laws. *See, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("[T]he inability to enforce its duly enacted plan clearly inflicts irreparable harms on the State."); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time [a State is blocked] from effectuating statutes enacted by reprsentatives of its people, it suffers a form of irreparable injury."); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("[T]he State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its law.").[2]

In their Response, Defendants contend that Plaintiffs' injuries are "wholly conjectural" because "Plaintiffs simply assume that their policies are noncompliant" with the Final Rule. Dkt. 15 at 21. Defendants rely on *Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016) to argue that Plaintiffs' injuries are not sufficiently imminent to justify an injunction because OCR would have

---

[2] And when States "assert [their] rights under federal law" to protect their quasi-sovereign interests "in the health and well-being—both physical and economic—of [their] residents in general," they have *parens patriae* standing. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982); *see also Texas v. Becerra*, 577 F. Supp. 3d 527, 559 (N.D. Tex. 2021) (granting a preliminary injunction and finding that Texas had *parens patriae* standing to assert the State's interests "in the health and well-being . . . of its residents in general" to prevent the adverse impact of federal COVID-19 vaccine mandates on Head Start offerings).

to gather information about Plaintiffs' bases for their policies before determining whether an enforcement action is warranted. Dkt. 15 at 22.

But there is nothing left to discover. Plaintiffs refuse to comply with the Final Rule. In addition to the Final Rule's conflicts with state law, the Texas Department of Health & Human Services acknowledged that its policies violate the terms of the Final Rule. *See* Dkt. 2-1 at ¶¶ 5–6. Even so, Plaintiffs need only demonstrate that their polices are "*arguably* affected with a constitutional interest, but proscribed by [the Final Rule.]" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (emphasis added). Plaintiffs have done that.

And Defendants cannot coerce to Plaintiffs to "resolve" their dispute "by informal means." Dkt. 15 at 4 (quoting 45 C.F.R. § 80.7(c)). Defendants' reliance on *Hood*, *see* Dkt. 15 at 22, is misplaced. As the Fifth Circuit recently held, when "the agency refuses to provide a single additional fact that would be required to adjudicate the present action," *Hood* does not apply. *Braidwood Management, Inc. v. Equal Employment Opportunity Comm'n*, 70 F.4th 914, 929 (5th Cir. 2023). Defendants do not seriously contest that the Plaintiff States' laws violate the Final Rule, *see* Dkt. 15 at 19–20, and the only reason Defendants have *yet* to bring an enforcement action against the Plaintiff States is that the Final Rule doesn't go into effect until July 5, 2024. This case, therefore, more closely resembles *Braidwood Management, Inc.* because (1) this Court knows what violates the Final Rule, (2) it knows what Plaintiffs' exact policies are, and (3) it has admissions from Plaintiffs that their current practices violate the Final Rule. *Cf. Braidwood Management, Inc.*, 70 F.4th at 929. Such injuries are accordingly far from speculative, especially when Defendants "ha[ve] not forsworn or disclaimed [their] willingness to bring an enforcement action against plaintiffs" and have failed to "declare affirmatively that [they] will not enforce [the Final Rule] against" Plaintiffs' state laws and policies. *Id.* at 920.

Finally, Defendants' insistence on a lack of imminence fares no better. The Final Rule is going into effect four days from now. 89 Fed. Reg. at 37, 522. And while Defendants point to the delayed effective date for written policies and procedures requirement being within one year of that effective date, there are other requirements that become effective July 5, 2024 that pose more

imminent harms on Plaintiff States.[3] Plaintiffs "need not assume such risks while waiting for [HHS] to drop the hammer in order to have their day in court." *Hawkes Co.*, 578 U.S. at 600.

## IV.   The scope of requested relief is proper.

This Court should stay the Final Rule pending a decision on the merits. Plaintiff States seek a stay of the Final Rule under § 705, which provides that a "reviewing court" may "issue all necessary and appropriate process to postpone the effective date of an agency action or to prserve status or rights pending conclusion of the review proceedings."[4] "[T]he scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Career Colleges & School of Texas v. United States Dep't of Education*, 98 F.4th 220, 255 (5th Cir. 2024). Indeed, "[t]he default rule is that vacatur is the appropriate remedy." *Data Mktg. Partn., LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022). Thus, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Career Colleges*, 98 F.4th at 255.

Defendants urge this Court to salvage some of the Final Rule with severability. Dkt. 15 at 25. In support, Defendants make passing reference to a severability clause. *Id.* (citing 45 C.F.R. § 92.2(c)). "But 'the ultimate determination of severability will rarely turn on the presence or absence' of a severability clause." *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1145 (D.C. Cir. 2022). At this preliminary stage, the Court is not obligated to examine hundreds of pages to winnow the field, all before July 5. "Judge are not like pigs, hunting for truffles buried [in the record]." *Murthy v. Missouri*, No. 23-411, 2024 WL 3165801, at *12 n.7 (U.S. June 26, 2024) (citation omitted, alterations in original). The Court should instead stay the rule "in its entirety"

---

[3] *See, e.g.*, 89 Fed. Reg. 37, 696 (codified at 45 C.F.R. § 92.5) (requiring entities like Plaintiff States to submit certificates of assurance that their health programs or activites are in compliance with Section 1557); *see also Grove City Coll. v. Bell*, 465 U.S. 555, 574–75 (1984) (upholding defunding for failure to file assurance as the "Department may properly condition federal financial assistance on the recipient's assurance that it will conduct the aided program or activity in accordance with Title IX and the applicable regulations").

[4] "Agency action" is defined to include "the *whole* . . . of an agency rule." 5 U.S.C. § 551(13) (emphasis added).

because Defendants didn't "brie[f] how [the court] might craft a limited stay," even though that was their burden. *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016). This Court need not tailor the Final Rule when Defendants made no attempt to do so. *See Texas v. United States (DACA)*, 691 F. Supp. 3d 763, 789 (S.D. Tex. 2023) (Hanen, J.).

Regardless, the Final Rule fails the test for severability, which turns on whether the agency would have adopted the rule without the vacated provisions, and whether it would "function sensibly." *DACA*, 691 F. Supp. 3d at 792–93 (S.D. Tex. 2023). Defendants lose on both because they "ma[de] no developed argument." *Data Mktg. P'ship*, 45 F.4th at 859–60. There is "substantial doubt" that the agency would have adopted an emasculated form of the Final Rule. *Baltimore v. Azar*, 439 F. Supp. 3d 591, 615 (D. Md.), *aff'd*, 973 F.3d 258 (4th Cir. 2020). The chief purpose of the Final Rule is to "implement § 1557's nondiscrimination protections" "consistent with the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020)." Dkt. 15 at 3. Erasing major provisions fatally undermines the rationale for the rule. *See Baltimore*, 439 F. Supp. 3d at 615.

Defendants "have not explained how the provisions should be severed" or how the Final Rule would sensibly function. *Id.* "[I]t is not the judiciary's duty or role to write or rewrite regulations or rules." *DACA*, 691 F. Supp. 3d at 793; *see also Tennessee v. Cardona*, 2024 WL 3019146, at *42–43. If Defendants' redefinition of discrimination on the basis of sex falls, then the Final Rule won't "survive . . . in anything approaching recognizable form." *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (cleaned up); *see Tennessee*, 2024 WL 3019146, at *43 (holding that the "severability clause had little impact . . . because the impermissible definition of 'discrimination on the basis of sex' . . . permeates the remaining regulations"). Preliminary relief against the entire rule gives the Court time to consider issues like severability when the administrative record is available. *See id.*; *Louisiana*, 2024 WL 2978786, at *21.

## Conclusion

Before July 5, 2024, the Court should grant Plaintiffs' Motion.

Dated: July 1, 2024.

Respectfully Submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**RYAN D. WALTERS**
Chief, Special Litigation Division


*/s/ Amy S. Hilton*
**AMY SNOW HILTON**
Special Counsel
Amy.Hilton@oag.texas.gov

**ETHAN SZUMANSKI**
Special Counsel
Ethan.Szumanski@oag.texas.gov

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

**COUNSEL FOR STATE OF TEXAS**

**AUSTIN KNUDSEN**
Attorney General of Montana

*/s/ Christian B. Corrigan*
**CHRISTIAN B. CORRIGAN**
 *Solicitor General*

**PETER M. TORSTENSEN, JR.**
 *Deputy Solicitor General*

Montana Department of Justice
215 N. Sanders Helena, MT 59601
Christian.Corrigan@mt.gov
Peter.Torstensen@mt.gov

**COUNSEL FOR STATE OF MONTANA**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically

(via CM/ECF) on July 1, 2024 and that all counsel of record were served by CM/ECF.

*/s/ Amy S. Hilton*
Amy S. Hilton