# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS and STATE OF MONTANA, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 6:24-cv-211-JDK |
| XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, et al., | § § § § § | |
| Defendants. | § § § | |

## MEMORANDUM OPINION AND ORDER

"How strangely will the Tools of a Tyrant pervert the plain Meaning of Words!" Samuel Adams, Letter to John Pitts (Jan. 21, 1776), *in* 3 THE WRITINGS OF SAMUEL ADAMS, 1773–1777, at 256 (Harry Alonzo Cushing ed.) (1907).  Here, federal agencies are attempting to impose a sweeping new social policy by manipulating and perverting the statutory text that constrains them.  Texas and Montana seek a stay or preliminary injunction to prevent the irreparable harm that will undoubtedly follow.  The Court grants the States' request.

This case arises out of a new final rule promulgated by the Department of Health and Human Services' Office for Civil Rights and the Centers for Medicare & Medicaid Services (collectively, "HHS").  Docket No. 2.  The rule would require healthcare providers and States to perform and pay for so-called "gender-transition" procedures—or else lose federal funding.  Nondiscrimination in Health Programs and

1

Activities, 89 Fed. Reg. 37,522 (May 6, 2024) (the "Final Rule").   HHS cites Section 1557 of the Affordable Care Act, Title IX of the Education Amendments of 1972, and provisions of the Social Security Act as authority.  These statutes, however, prohibit federally funded health programs from discriminating "on the basis of sex"— that is, from treating women worse than men and vice versa.  Nothing in these statutes authorizes HHS—or any federal official—to require healthcare providers to perform novel "gender-transition" procedures or force States to subsidize them.

In fact, both Texas and Montana generally exclude these procedures from their state Medicaid programs and prohibit providers from performing them on minors. The States thus brought this lawsuit challenging the Final Rule under the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq*.  The States argue that "neither Section 1557 nor Title IX permits [HHS] to promulgate this sweeping new rule," the Rule "purports to override and preempt all State laws to the contrary," and HHS has given the States "an impossible choice"—"violate and abandon state law or risk devastating financial loss."  Docket No. 2 at 1–2.  Most immediately, the States seek an order postponing the Final Rule's effective date and preliminarily enjoining HHS from enforcing it.  *See id*.

The Court **GRANTS** the States' motion.  As explained below, the States are likely to succeed on the merits because the Final Rule violates the APA, the States will likely suffer irreparable harm, and the balance of equities and public interest supports a stay.  Accordingly, under § 705 of the APA, the Court postpones the Final Rule's effective date pending conclusion of this proceeding.

## I.

Congress enacted the Patient Protection and Affordable Care Act, commonly referred to the Affordable Care Act or ACA, in March 2010.  111 Pub. L. No. 148 (Mar. 23, 2010).  Section 1557 of the ACA states:

> Except as otherwise provided for in this title . . . an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance.

42 U.S.C. § 18116(a).  Title IX in turn provides:  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).

When Congress enacted the ACA in 2010, no agency—or court—had ever interpreted "on the basis of sex" to mean "on the basis of gender identity."  But in 2016, HHS began to do so, issuing a rule purporting to implement Section 1557 and prohibiting discrimination on the basis of "gender identity."  81 Fed. Reg. 31,376 (May 18, 2016).  A court vacated this portion of the rule because the "expanded definition of sex discrimination exceeds the grounds incorporated by Section 1557." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 689 (N.D. Tex. 2016).[1]  In 2020, HHS issued a new rule, this time agreeing that prohibiting discrimination on the basis of "gender identity was contrary to the text of Title IX."  85 Fed. Reg. 37,160,

---

[1] The Fifth Circuit eventually dismissed the plaintiff's APA claim in this case as moot—but did not vacate the district court's orders and opinions—after the 2020 rule discussed below replaced the 2016 rule. *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–76 (5th Cir. 2022).

37,167–68 (June 19, 2020).  Courts later enjoined HHS from enforcing this portion of the rule.  *See, e.g., Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 60 (D.D.C. 2020).

In 2021, HHS issued a "Notification of Interpretation and Enforcement" addressing Section 1557.  Citing the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), the agency announced that it would "interpret and enforce section 1557 of the Affordable Care Act prohibition on discrimination on the basis of sex to include:  Discrimination on the basis of sexual orientation; and discrimination on the basis of gender identity."  United States Department of Health and Human Services, Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972, 86 Fed. Reg. 27,984 (May 25, 2021).  Once again, a court held that the notification was "not in accordance with the law" because "Title IX's 'on the basis of sex' language does not include 'sexual orientation' or 'gender identity' status" and *Bostock* "does not apply to Section 1557 or Title IX."  *Neese v. Becerra*, 640 F. Supp. 3d 668, 675, 684 (N.D. Tex. 2022).  And finally, in 2022, HHS issued guidance that again took the position that Section 1557 prohibits discrimination "on the basis of . . . gender identity," which the court in *Texas v. EEOC*, 633 F. Supp. 3d 824, 847 (N.D. Tex. 2022), vacated and set aside as unlawful.

Undeterred by these decisions, on May 6, 2024, HHS issued the Final Rule at issue here, Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522.  The Final Rule purports to "implement the nondiscrimination

4

requirements of section 1557" and "revis[es] provisions prohibiting discrimination on the basis of sex in regulations issued by the Centers for Medicare & Medicaid Services." *Id.* at 37,522. The Final Rule takes effect on July 5, 2024, and generally applies to any "covered entity"—that is, any healthcare provider or program that receives federal funds. *Id.* at 37,522–23.

Although the Final Rule specifically declines to define "sex," *id.* at 37,575, it expands the definition of "discrimination on the basis of sex" to a non-exhaustive list that includes discrimination on the basis of: "(i) Sex characteristics, including intersex traits; (ii) Pregnancy or related conditions; (iii) Sexual orientation; (iv) Gender identity; and (v) Sex stereotypes." *Id.* at 37,699, *to be codified at* 45 C.F.R. § 92.101(a)(2).

## A.   Application to Providers

The Final Rule first applies its expanded definition of "on the basis of sex" to require certain actions from covered healthcare providers and programs—that is, "[e]very health program or activity, any part of which receives Federal financial assistance, directly or indirectly, from the Department." *Id.* at 37,692, *to be codified at* § 92.2(a)(1).

Specifically, the Final Rule prohibits a covered entity from denying or limiting health services to an individual based upon the individual's "sex assigned at birth, gender identity, or gender otherwise recorded," including services that "have been typically or exclusively provided to, or associated with, individuals of one sex." *Id.* at 37,700, *to be codified at* § 92.206(b)(1). While HHS explains that this section would require providers to perform a prostate cancer screening to a "transgender woman"

5

for example, 87 Fed. Reg. 47,824, 47,865–66, the plain language also compels the absurd result of requiring a provider to perform a prostate cancer screening on a biological woman who demands one.[2]

The Final Rule bars covered entities from "treating individuals differently or separating them on the basis of sex in a manner that subjects any individual to more than *de minimis* harm, including by adopting a policy or engaging in a practice that prevents an individual from participating in a health program or activity consistent with the individual's gender identity."  89 Fed. Reg. at 37,701, *to be codified at* § 92.206(b)(3).  In other words, a provider must allow biological males who "identify" as female into female-exclusive facilities, including shared hospital rooms.  *See id.* at 37,593 ("A covered entity will be in violation of this rule if [it] refuse[s] to admit a transgender person for care or refuse to place them in facilities consistent with their gender identity, because doing so would result in more than *de minimis* harm.").

Covered entities are further prohibited from denying a patient "gender transition or other gender-affirming care that the covered entity would provide to an individual for other purposes if the denial or limitation is based on an individual's sex assigned at birth, gender identity, or gender otherwise recorded."  *Id.* at 37,701, *to be codified at* § 92.206(b)(4).  As the States explain, this means, for example, that any provider who would perform a hysterectomy to treat uterine cancer must also be

---

[2] Helpfully, after HHS begins investigating a provider who refuses to perform a prostate exam on a biological woman, HHS promises that it will recognize that the patient's lack of a prostate is a legitimate, nondiscriminatory basis the provider could raise in defense.  *See* 87 Fed. Reg. at 47,867 ("For example, a covered entity would not be required to perform a cervical exam on an individual who does not have a cervix, or to perform a prostate exam on an individual who does not have a prostate.").

willing to perform the elective removal of a healthy uterus for purposes of "gender transition."  Docket No. 1 at ¶¶ 67–68.

HHS asserts that the Final Rule "does not interfere with individualized clinical judgment about the appropriate course of care for a patient" and that "[t]here is no part of section 1557 that compels clinicians to provide a service that they do not believe is medically appropriate for a patient."  89 Fed. Reg. at 37,575.  But the Final Rule also requires that a provider refusing services to a patient must reasonably determine that those health services are not clinically appropriate for "a particular individual" and that the determination is not a "pretext for discrimination."  *Id.* at 37,701, *to be codified at* § 92.206(c).  And a provider violates the Final Rule by universally declining to perform "gender-transition" procedures based on the belief that such procedures are always detrimental to the patient.  *See* 87 Fed. Reg. at 47,867 ("However, a provider's view that no gender transition or other gender-affirming care can ever be beneficial for such individuals (or its compliance with a state or local law that reflects a similar judgment) is not a sufficient basis for a judgment that a health service is not clinically appropriate.").[3]

## B.    Application to Insurance Plans

The Final Rule also applies its expanded view of "on the basis of sex" to certain federally funded health insurance programs, including Medicaid and the Children's Health Insurance Program ("CHIP").  *See* 89 Fed. Reg. at 37,667 (explaining that

---

[3]  HHS removed this specific language from § 92.026(c) in the Final Rule but explains that it would still apply similar standards in any investigation of alleged discrimination.  *See* 89 Fed. Reg. at 37,597–98.

language in the CMS regulations will conform to the revised language of § 92.101(a)(2)). Under the Final Rule, CMS amends several sections in the related regulations to apply the expanded view of "on the basis of sex" to include "sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes." 89 Fed. Reg. at 37,691, *to be codified at* 42 C.F.R. §§ 438.3, 438.206, 440.262. 460.98, 460.112.

Covered entities providing or administering health insurance coverage—including state-based insurance systems like Medicaid and CHIP—are prohibited from discriminating based on the expanded meaning of "sex." *Id.* at 37,701, *to be codified at* 45 C.F.R. § 92.207. Specifically, this section prohibits any "categorical coverage exclusion or limitation for all health services related to gender transition or other gender-affirming care" and any denial or limitation of a claim for "specific health services related to gender transition or other gender-affirming care." *Id.*, *to be codified at* § 92.207(b)(4), (5). Like the requirements governing healthcare providers, these provisions make clear that a health insurance entity violates the Final Rule by denying coverage for "gender-affirming care" unless the entity can articulate a rationale that HHS considers a "legitimate, nondiscriminatory reason" that does not "constitute a pretext for discrimination." *Id.*, *to be codified at* § 92.207(c).

As applied to state-sponsored insurance plans like Medicaid and CHIP, the Final Rule has the effect of requiring states to pay for "transition" and other "gender-affirming" procedures.

As stated above, the Final Rule takes effect on July 5, 2024. *Id.* at 37,522–23.

8

## II.

The States seek an order postponing the Final Rule's effective date and enjoining HHS from enforcing it pending the outcome of this case.

The APA provides that "the reviewing court" may issue equitable relief "to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705; *see also, e.g., Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) ("We have the power to stay the agency's action 'to the extent necessary to prevent irreparable injury.'" (quoting § 705)).  Courts grant relief under § 705 based on the traditional four equitable factors for injunctive relief:  (1) plaintiff's likelihood of success on the merits; (2) the threat of irreparable harm without a stay; (3) "whether other interested parties will be irreparably injured by a stay;" and (4) the public interest.  *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1135 (5th Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 426 (2009)).  "The first two factors are the most critical."  *Id.* (quoting *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020)).  Once a plaintiff has made a showing under the first two factors, the third and fourth factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

As discussed below, each factor weighs in favor of granting a stay here.[4]

---

[4] Because the Court finds that staying the effective date of the Final Rule under § 705 is the appropriate remedy here, the Court declines to issue a temporary restraining order or order a preliminary injunction.  A stay—essentially a "temporary form of vacatur"—is a "less drastic remedy" than an injunction because it "does not order the defendant to do anything; it only removes the source of the defendant's authority."  *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 254 (5th Cir. 2023) (quotation omitted), *rev'd on other grounds*, 602 U.S. 367 (2024).

### A.     Likelihood of Success on the Merits

The States argue they are likely to succeed on the merits because the Final Rule conflicts with the ACA and Title IX and therefore violates the APA.  *See* Docket No. 2 at 6–11 (citing 5 U.S.C. § 706(2)(A), (C)).[5]  They contend that neither Section 1557 of the ACA nor Title IX authorizes HHS to require the performance of "'gender-affirming' medical activities as a condition of receiving federal funds."  *Id.* at 6.  For similar reasons, the States also challenge portions of the Final Rule amending several of CMS's managed care regulations.  *Id.* at 10–11.  HHS responds that "the protections against gender identity discrimination" challenged by the States "flow ineluctably from *Bostock*."  Docket No. 15 at 1, 9–10.

HHS is wrong.

### 1.

Congress enacted the APA in 1946 "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'  *Loper Bright Enters. v. Raimondo*, ___ U.S. ___, 2024 WL 3208360, at *12 (2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)).  The APA thus requires a reviewing court to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A), (C).

---

[5] The States also argue that the Final Rule is arbitrary and capricious and violates the Constitution. Docket No. 2 at 11–14.  Because the Court concludes that the Rule exceeds statutory authority, it need not address the States' remaining arguments.  *See Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 246 (5th Cir. 2023).

In reviewing agency action under the APA, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and should "set aside any [] action inconsistent with the law as they interpret it." *Loper Bright*, 2024 WL 3208630, at *12, 22.  A court should no longer defer to an agency's interpretation of a statute but should decide for itself "whether the law means what the agency says." *Id*. at *12, 22 (overruling *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

The Court thus owes no deference to HHS's interpretation of the governing statutes, but rather "begins with the text" of the statute—as all courts do. *E.g.*, *Ross v. Blake*, 578 U.S. 632, 638 (2016); *United States v. Lauderdale Cnty.*, 914 F.3d 960, 961 (5th Cir. 2019); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[A] legislature says in a statute what it means and means in a statute what it says there.").  In doing so, the Court applies the "fundamental canon of statutory construction" that the words "should be interpreted as taking their ordinary meaning at the time Congress enacted the statute." *E.g.*, *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (cleaned up); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69–77 (2012) ("The ordinary-meaning rule is the most fundamental semantic rule of interpretation."); *Loper Bright*, 2024 WL 3208360, at *16 ("[E]very statute's meaning is fixed at the time of enactment." (quoting *Wis. Cent. Ltd.* v. *United States*, 585 U.S. 274, 284 (2018))).  The Court, moreover, must examine "the language and design of the statute as a whole." *E.g.*, *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *see also*

*Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 397 (5th Cir. 2006) (Courts "must read the statute as a whole, so as to give effect to each of its provisions without rendering any language superfluous.").

### 2.

Here, the key text is Title IX, a 1972 statute prohibiting discrimination in education programs "on the basis of sex." 20 U.S.C. § 1681(a). HHS claims that this phrase prohibits discrimination on the basis of "gender identity." Docket No. 15 at 8; *see also* 89 Fed. Reg. at 37,571. But when Title IX was enacted in 1972, "sex" unambiguously meant only a person's biological sex—"an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (Brennan, J.) (plurality opinion). Dictionaries from the time convincingly support this view. *See, e.g.*, *Sex*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1976) ("The property or quality by which organisms are classified according to their reproductive functions."); *Sex*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1979) (same); *Sex, Female, Male,* OXFORD ENGLISH DICTIONARY (re-issue ed. 1978) (defining "sex" as "[e]ither of the two divisions of organic beings distinguished as male and female respectively," "female" as "[b]elonging to the sex which bears offspring," and "male" as "[o]f or belonging to the sex which begets offspring, or performs the fecundating function of generation").

Numerous courts have reached the same conclusion, holding that Title IX prohibits discrimination "between males and females" only. As the Eleventh Circuit sitting en banc recently held: "Reputable dictionary definitions of 'sex' from the time of Title IX's enactment show that when Congress prohibited discrimination on the

12

basis of 'sex' in education, it meant biological sex, i.e., discrimination between males and females." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (en banc) (citing several contemporaneous dictionaries); *see also Tennessee v. Cardona*, ___ F. Supp. 3d ___, 2024 WL 3019146, at *9 (E.D. Ky. June 17, 2024) (determining that "[a]t that time, the term ordinarily was understood to mean 'the character of being either male or female'" based on several contemporaneous dictionaries); *Texas v. Cardona*, ___ F. Supp. 3d ___, 2024 WL 2947022, at *30 (N.D. Tex. June 11, 2024) ("[T]he term 'sex' meant only a person's biological sex—that is, either male or female . . . ." (citing *Frontiero*, 411 at 686, other cases, and contemporaneous dictionaries)); *Neese*, 640 F. Supp. 3d at 678 n.6 (citing dictionaries to explain that "'sex' was commonly understood to refer to physiological differences between men and women—particularly with respect to reproductive functions").

Other provisions in Title IX confirm that "on the basis of sex" means only "on the basis of an individual's biological sex." *See* SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167–169 (courts should "consider the entire text" because "[c]ontext is a primary determinant of meaning."). For example, the statute repeatedly contrasts "students of one sex" with "students of both sexes," and it permits "father-son" or "mother-daughter" activities as long as "reasonably comparable activities" are provided for "students of the other sex." 20 U.S.C. § 1681(a). The statute, moreover, authorizes separation based on biological sex in certain situations, including in single-sex schools and single-sex organizations like fraternities and sororities. *Id.* § 1681(a)(5), (6). These provisions make sense only if

"on the basis of sex" means "on the basis of biological sex," not "on the basis of gender identity or sexual orientation."  *E.g., Adams*, 57 F.4th at 813 (noting that if "'sex' [were] ambiguous enough to include 'gender identity,'" then the "carveouts . . . would be rendered meaningless"); *Tennessee v. Cardona*, 2024 WL 3019146, at *9–10 ("When Title IX is viewed in its entirety, its various provisions confirm that 'sex' means the character of being male or female."); *Texas v. Cardona*, 2024 WL 2947022, at *32 ("Title IX explicitly appreciates the innate biological variation between men and women that occasionally warrants differentiation—and even separation—to preserve educational opportunities and to promote respect for both sexes."); *Franciscan All.*, 277 F. Supp. 3d at 688 (Title IX's "authorized distinctions based on sex can only reasonably be interpreted to be necessary for the protection of personal privacy, and confirm Congress's biological view of the term 'sex.'"); *Neese*, 640 F. Supp. 3d at 680–81 ("If 'on the basis of sex' included 'sexual orientation' and 'gender identity,' as Defendants envision, Title IX and its regulations would be nonsensical."); *Louisiana v. Dep't of Educ.*, 2024 WL 2978786, at *11 (W.D. La. June 13, 2024) ("Together, the ordinary meaning of 'sex discrimination' at the time of enactment and the 1975 regulations of Title IX indicate that 'sex discrimination' included only biological males or females.").

HHS contends that the Supreme Court's 2020 decision in *Bostock* compels its interpretation of Title IX to prohibit discrimination on the basis of "gender identity" and "sexual orientation."  89 Fed. Reg. at 37,574.  Not so.  *Bostock's* holding was limited and clear:  "The only question before us is whether an employer who fires

someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex'" under Title VII of the Civil Rights Act of 1964.  590 U.S. at 681.  *Bostock* did not consider the meaning of "on the basis of sex" in Title IX.  *See id.* (emphasizing that the Court's holding should not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination"); *see also, e.g.*, *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 62–63 (2d Cir. 2023) (Menashi, J., concurring) (explaining "important differences" between Title VII and Title IX in the context of *Bostock*);  *L.W. v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023) (explaining that the "text-driven reasoning" of *Bostock* "applies only to Title VII, as *Bostock* itself and many subsequent cases make clear"); *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("[T]he rule in *Bostock* extends no further than Title VII."); *Adams v. Sch. Bd. of St. James Cnty.*, 3 F.4th 1299, 1336 (11th Cir. 2021) (Pryor, C.J., dissenting) (explaining that *Bostock* "does not extend to Title IX"), *majority op. vacated by* 57 F.4th 791 (11th Cir. 2022) (en banc); *Neese*, 640 F. Supp. 3d at 676 ("One cannot rely on the words and reasoning of *Bostock* itself to explain why the Court prejudged what the Court expressly refused to prejudge.").

Further, the Supreme Court's reasoning in *Bostock* does not apply to Section 1557 or Title IX.  *Bostock* relied heavily on the phrase "because of" in Title VII to impose a "sweeping standard" of causation.  590 U.S. at 656.  Title IX does not include similar language, and the Supreme Court has not imposed a similar standard regarding the phrase "on the basis of."  *See Neese*, 640 F. Supp. 3d at 679 (*Bostock*'s

interpretation of "because of" in Title VII does not apply to "on the basis of" in Title IX).  Title VII, moreover, is concerned with discrimination in employment, where "[a]n individual employee's sex is 'not relevant to the selection, evaluation, or compensation of employees,'" *Bostock*, 590 U.S. at 660 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (plurality opinion)).  In contrast, Title IX addresses discrimination in education, and Section 1557 is concerned with discrimination in healthcare—areas of life in which an individual's biological sex is often relevant and sometimes critical.  *See Adams*, 57 F.4th at 808 (distinguishing *Bostock* in analyzing Title IX in part because Title IX "is about schools and children—and the school is not the workplace.").

In sum, the Court interprets Title IX's phrase "on basis of sex" as it was reasonably understood at the time the statute was enacted.  *See, e.g.*, SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 78–92.  "The upshot [of this principle] is that new rights cannot be suddenly 'discovered' years later in a document, unless everyone affected by the document had somehow overlooked an applicable provision that was there all along."  *Id*. at 81.  And here, there is no question that at the time Congress enacted Title IX, everyone understood the statute to prohibit treating members of one sex (women) worse than the other (men).  As one court explained, "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities, which was documented in hearings held in 1970 by the House Special Subcommittee on Education." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275,

286 (2d Cir. 2004).  This is undoubtedly why HHS itself previously recognized that Title IX does not "encompass gender identity."  *See* 85 Fed. Reg. at 37,167–68.

Ignoring this long-held meaning of Title IX, HHS now wants to expand the statute to prohibit discrimination "based upon the individual's sex assigned at birth, gender identity, or gender otherwise recorded."  89 Fed. Reg. at 37,700, *to be codified at* § 92.206(b)(1).   But an agency has no authority to promulgate a rule that contradicts the language of the statute.  *See* 5 U.S.C. § 706; *Contender Farms, L.L.P. v. Dep't of Agric.*, 779 F.3d 258, 274 (5th Cir. 2015) ("[A] broad grant of general rulemaking authority does not allow an agency to make amendments to statutory provisions"); *Texas v. Cardona*, 2024 WL 2947022, at *36, 43 (same).  Nor may an agency "rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014); *accord Benjamin v. United States*, 932 F.3d 293, 300 (5th Cir. 2019).  That is what HHS has attempted to do here in the Final Rule.

The Rule thus violates the APA, and the States are likely to succeed on their merits claim.

### 3.

The Final Rule also amends certain sections of CMS's managed care regulations under Title 42 to incorporate HHS's expanded view of sex discrimination. The new regulations now prohibit any discrimination based on "sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes." 89 Fed. Reg. at 37,691–92, *to be codified at* 42 C.F.R. §§ 438.3(d)(4),  438.206(c)(2),  440.262,  460.98(b)(3),  460.112(a).   HHS   cites

sections 1902(a)(4), 1902(a)(19), and 2101(a) of the Social Security Act (codified at 42 U.S.C. §§ 1396a(a)(4), 1396a(a)(19), and 1397aa(a), respectively) as authority to promulgate these sections of the Final Rule.  89 Fed. Reg. at 37,668.  But as with Section 1557 and Title IX, these provisions do not authorize the sweeping changes that HHS, through CMS, attempts here.

Specifically, section 1902(a)(4) provides that state Medicaid plans must provide "such methods of administration . . . as are found by the [HHS] Secretary to be necessary for the proper and efficient operation of the plan."  42 U.S.C. § 1396a(a)(4).  The statute also provides a non-exhaustive list of "methods of administration," including establishing "personnel standards," providing for "utilization of professional medical personnel," and ensuring "necessary transportation for beneficiaries."  *Id.*  It would stretch the bounds of credulity to read this list of commonplace tasks as providing the authority to impose radical social change by requiring states to pay for "gender-affirming" care.  *See, e.g.*, *Easom v. US Well Servs., Inc.*, 37 F.4th 238, 243 (5th Cir. 2022) ("Congress's use of the term 'such as' 'indicat[es] that there are includable other matters *of the same kind* which are not specifically enumerated by the standard.'" (quoting *Donovan v. Anheuser-Busch, Inc.*, 666 F.2d 315, 327 (8th Cir. 1981))) (emphasis added).

Similarly, section 1902(a)(19) provides only that Medicaid plans must operate in a manner consistent with "the best interests of the recipients."  42 U.S.C. § 1396a(a)(19).  And section 2101(a) merely describes the purpose of the subchapter as providing funds to states to allow child health assistance "in an effective and

efficient manner."  42 U.S.C. § 1397aa(a).  Nothing cited gives CMS the authority to prohibit discrimination on the basis of gender identity—and effect the kind of sweeping social policy change the agencies attempt here.  The Court is "confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).  Accordingly, the States are likely to succeed on the merits of their claim that these portions of the Final Rule also violate the APA.

\*   \*   \*

This factor heavily favors staying the Final Rule's effective date.

## B.   Irreparable Harm

The States must also demonstrate "a substantial threat of irreparable injury if the injunction is not issued."  *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015). For the threat of injury to be sufficiently "substantial," the States must show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  For an injury to be sufficiently "irreparable," the States need only show that the alleged injury "cannot be undone through monetary remedies."  *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017). Where, as here, "the likelihood of success on the merits is very high, a much smaller quantum of injury will sustain an application for preliminary injunction."  *Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam)), *aff'd*, 140 F.3d 1060 (D.C. Cir. 1998).

The States have met their burden.

19

**1.**

If the Final Rule's effective date is not stayed, the States are likely to lose billions of dollars in federal funding for their Medicaid and CHIP programs for refusing to comply.  This injury is both substantial and irreparable.

The Final Rule is enforced through the provisions of Title IX, which make clear that HHS may effect compliance by the "termination of or refusal to grant or to continue assistance" for the program at issue once "there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement."  20 U.S.C. § 1682; 89 Fed. Reg. at 37,701, *to be codified at* § 92.301. Montana receives approximately $2 billion in federal financial aid administered by HHS every year.  Docket No. 1 ¶ 138.  Texas likewise receives billions of dollars in HHS-administered federal financial aid.  *Id.* ¶ 131.  And the States have presented evidence that HHS-administered funds would likely be withheld for violating the Final Rule.  *See, e.g.*, Docket No. 2, Ex. B ¶¶ 6–9.  In fact, HHS does not dispute that the States stand to lose billions in federal funds for refusing to comply with the Final Rule.  *See* Docket No. 15 at 19–20.

The loss of such funding for Medicaid and CHIP would devastate these programs and their beneficiaries.  Even the possibility of loss would have an "immediate effect on the States' ordering of their own affairs."  *Tennessee v. Cardona*, 2024 WL 3019146, at *41 (citing *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 2024 WL 2984295, at *20 (6th Cir. 2024)).  And no one disputes that the actual amount of such loss poses "a substantial threat" here.  *Texas v. United States*, 809 F.3d at 150; *see also Texas v. Becerra*, 577 F. Supp. 3d 527, 557 (N.D. Tex. 2021) (finding that

20

Texas faced an irreparable harm in either losing federal funding or bearing compliance costs).  The loss, moreover, would be irreparable because sovereign immunity would prevent the States from recovering the loss through monetary remedies—a point HHS does not dispute.  *Wages & White Lion Invs.*, 16 F.4th at 1142; *Texas v. EPA*, 829 F.3d at 434.

HHS argues that the loss of federal funding is conjectural because the States only assume that their policies are discriminatory, and that any potential loss of funding is not sufficiently imminent.  Docket No. 15 at 19–20.  These arguments fail.  The States have represented that they do not and will not provide "gender-affirming" care through their State-run Medicaid and CHIP programs, they "refuse to comply with the Final Rule," and the "informal means" of seeking resolution prescribed by the Final Rule will not coerce their compliance.  Docket No. 17 at 6–8.  Thus, the States' loss of federal funds is a matter of when, not if.  And HHS provides no guaranteed timeline for the "extensive procedures" they claim will be required to strip the States of funding.  Docket No. 15 at 20.  HHS could potentially suspend or terminate funds within just over a month under certain circumstances.  *See* 45 C.F.R. § 80.8(c).

HHS would require the States to violate the Final Rule, hold out through the "informal means" of potential resolution, and experience the discipline of having their federal funds revoked.  Only then, with billions of dollars on the line, HHS contends, would the States be allowed to test the merits of their argument in the crucible of judicial review.  *See* Docket No. 15 at 19–20; *Tennessee v. Dep't of Educ.*, 2024 WL

2984295, at *20 ("As the Department reads § 1683, the States must lose their federal funding through an enforcement proceeding before bringing any claims to federal court."). But plaintiffs are not required "to bet the farm by taking the violative action before testing the law." *Id.* (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010)).

## 2.

Even if HHS forced Texas and Montana to comply with the Final Rule, the States would suffer irreparable injury.

As noted above, both Texas and Montana generally bar healthcare providers from providing so-called "gender-affirming" treatments and surgeries on minors. Tex. Health & Safety Code § 161.702;[6] Mont. Code § 50-4-1004(1).[7]  And both States exclude such treatments from their Medicaid and CHIP programs.  Docket No. 1 ¶¶ 119, 121, 134.  By following the new "gender-identity" provisions in the Final Rule, the States would be violating their own laws and precluded from enforcing those laws against others.

Numerous courts have held that states suffer injury when a federal agency interferes with the enforcement of state law.  *Texas v. United States*, 809 F.3d at 153; *see also Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 836 (5th Cir. 2023) (holding that a state has standing based on the "preemption of an existing state law" or "a

---

[6] The Texas Supreme Court recently upheld Texas's statute against challenges that it violates the Texas Constitution. *Texas v. Loe*, ___ S.W.3d ___, 2024 WL 3219030 (Tex. June 28, 2024).

[7] HHS argues that Montana cannot show an injury on this basis because the state law in question is currently enjoined in state court. Docket No. 15 at 22.  Montana has appealed that ruling.  Docket No. 1 ¶ 134.  But Montana still does not pay for "gender-affirming" treatments or surgeries. *Id.* ¶ 136.

conflict between federal and state law if the state statute at issue regulates behavior or provides for the administration of a state program."); *The Daily Wire, LLC v. Dep't of State*, ___ F. Supp. 3d ___, 2024 WL 2022294, at *5–6 (E.D. Tex. May 7, 2024) (Texas plausibly alleged injury "to its sovereign interest in enforcing H.B. 20" by alleging that federal agency was "encouraging social media platforms to violate H.B. 20"); *see also Jacobson v. Massachusetts*, 197 U.S. 11, 25–26 (1905) (states have a sovereign interest in exercising their police powers to protect the health and welfare of their citizens).

The Final Rule's nondiscrimination requirements, moreover, claim to "generally preempt conflicting State law"—like those of Texas and Montana. 89 Fed. Reg. at 37,598. And an agency's formal position that a state law is preempted can further injure a state's sovereign interests. *See Texas v. EEOC*, 933 F.3d 433, 437–40, 446–49 (5th Cir. 2019) (holding that Texas had standing to challenge EEOC guidance that deemed unlawful under Title VII Texas state agencies' across-the-board bans on hiring individuals with criminal records).

These harms are irreparable. *See, e.g., Texas v. Becerra*, 623 F. Supp. 3d 696, 736 (N.D. Tex. 2022) ("[I]rreparable harm exists when a federal agency action prevents a state's enforcement of its duly enacted laws." (citing *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018))); *see also Franciscan All., Inc.*, 227 F. Supp.3d at 694 ("A state suffers irreparable harm anytime it is prevented from enforcing a statute enacted by representatives of its people." (citing *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013))); *Maryland v.*

*King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

* * *

These alternative irreparable injuries weigh in favor of staying the Final Rule's effective date.

### C.   Balance of the Equities and Public Interest

The third and fourth factors require the Court to weigh the harms and public interest in granting or denying the States' requested relief.  "Federal courts have considered the balance of equities and public interest factors together as they overlap considerably."  *Texas v. United States*, 524 F. Supp. 3d 598, 663 (S.D. Tex. 2021) (citing cases); *Nken*, 556 U.S. at 435 (balance of equities and public interest considerations "merge when the Government is the opposing party").

The States argue that the Court should maintain the status quo, preserving the relative positions of the parties pending a trial on the merits of their claims. Docket No. 2 at 15.  The States further explain that the Final Rule forces healthcare providers in Texas and Montana into the dilemma of choosing between violating state law or risking losing millions of dollars in federal funding.  *Id.* at 4–5; *id.*, Ex. A ¶¶ 4–6; *id.*, Ex. B ¶¶ 4–6.  HHS argues that allowing enforcement of the Final Rule will "combat discrimination in health programs and activities receiving federal funds."  Docket No. 15 at 24.

The Court finds that the injuries likely to occur if the Final Rule takes immediate effect easily outweigh "any harm that will result if the injunction [or stay]

24

is granted." *Texas v. United States*, 809 F.3d at 186 (quoting *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013)).  The States have shown "a concrete threatened injury in the form of millions of dollars of losses" by healthcare providers who resist the Final Rule's unlawful directives.  *Id.*  The States have also demonstrated that their own immediate compliance costs or reductions in federal funding would not be easily restored, if at all, in the absence of a stay.  *See id.* at 187 (finding preliminary injunction appropriate "given the difficulty of restoring the *status quo ante*").  HHS's claimed harms, in contrast, are less substantial and vaguely defined—and are based on a clear misreading of the governing statutes.  *See, e.g., id.*; *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (finding alleged compliance costs outweighed agency's interest in perpetuating "unlawful agency action").

Finally, the public interest "always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve."  *Camacho v. Tex. Workforce Comm'n*, 326 F. Supp. 2d 794, 802 (W.D. Tex. 2004) (quoting *Finlan v. City of Dallas*, 888 F. Supp. 779, 791 (N.D. Tex. 1995)).  As explained above, the Final Rule likely violates the law and exceeds the scope of HHS's authority.  The public interest in an injunction thus outweighs HHS's interest in the freedom to implement its own policies.  *See Wages & White Lion*, 16 F.4th at 1143 ("[T]here is generally no public interest in the perpetuation of unlawful agency action." (quoting *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021)).

Accordingly, the third and fourth factors weigh in favor of a stay here.

## III.

Having determined that a stay is necessary under 5 U.S.C. § 705, the Court considers its proper scope.  A court should generally not impose relief that is "more burdensome to the defendant than necessary" to redress the plaintiff's injuries. *Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  Section 705 is also instructive:  "[T]o the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action . . . pending conclusion of the review proceedings."  *Cf.* § 706 (requiring that a reviewing court "shall" "hold unlawful and set aside agency action" that violates the APA).  The permissive language of § 705 grants Court considerable discretion in crafting relief.

### A.    Geographic Limits

Here, Texas and Montana have demonstrated injuries that they and covered providers in these two States are likely to suffer.  There is no evidence of potential imminent harm to other parties.  Thus, a stay limited to all covered entities within Texas and Montana accords with the record before the Court and will preserve these States' and their citizens' rights while fully insulating them from harm.  *See Braidwood Mgmt., Inc. v. Becerra*, ___ F.4th ___, 2024 WL 3079340, at *16–17 (5th Cir. June 21, 2024) (affirming injunction as to the plaintiffs who had standing and reversing universal remedial relief); *Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) (affirming preliminary injunction as to fourteen plaintiff states and reversing as to entry of nationwide preliminary injunction).

26

### B.      Substantive Limits

HHS argues that the Court should limit relief to the parts of the Rule that the States "actually challenge[]"—specifically, "the Rule's interpretation of § 1557's prohibition on sex discrimination to include discrimination on the basis of gender identity."  Docket No. 15 at 25 (quoting *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024)).  But HHS's improper interpretation of Title IX and its overreach as to the Social Security Act permeate the Final Rule.  *See, e.g.*, §§ 42 C.F.R. 438.3, 438.206, 440.262, 460.98, 460.112; §§ 45 C.F.R. 92.101, 92.206, 92.207, 92.208, 147.104, 155.120, 155.220, 156.200, 156.1230.    While HHS cites the severability clause in the Final Rule, § 92.2(c), it provides no guidance on how the Court should excise the offending provisions.  "[I]t is not the judiciary's duty or role to write or rewrite regulations or rules, especially those that substantively contravene existing legislation."  *Texas v. United States*, 691 F. Supp. 3d 763, 793 (S.D. Tex. 2023).  The Court declines to do so here.

### IV.

For the reasons explained above, the Court **GRANTS** the States' motion seeking a stay of the Final Rule's effective date.  Docket No. 2.

The Court hereby **ORDERS** that the effective date of all portions of the May 6, 2024 Final Rule, Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522, is **STAYED** as to Texas and Montana and all covered entities in those States until further order of the Court.

So **ORDERED** and **SIGNED** this **3rd**  day of  **July, 2024.**

JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE